# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

**PRUVIT VENTURES, INC,**                              Civil Action No.:

    Plaintiff,                                        4:15-CV-00571-ALM-CAN


V.

                                    **Honorable Judge Amos L. Mazzant**

**AXCESS GLOBAL SCIENCES, LLC**

and

**FOREVERGREEN**                        **AMENDED COMPLAINT**

**INTERNATIONAL, LLC,**

        Defendants.                        **Jury Requested**



## PRUVIT VENTURES, INC'S AMENDED COMPLAINT

Plaintiff, Pruvit Ventures, Inc. (hereinafter "Plaintiff" or "Pruvit") by its undersigned counsel, as for its Complaint seeking relief against Defendants Axcess Global Sciences, LLC (hereinafter "Axcess" individually or collectively with ForeverGreen "Defendants") and ForeverGreen International, LLC (hereinafter "ForeverGreen" or collectively with Axcess "Defendants"), alleges as follows:

---

ORIGINAL COMPLAINT                                                          Page 1

## I.    General Summary of the Case

1. This matter arises from desire to by Axcess to sell technology to the highest bidder, no matter the cost or harm to the parties seeking to make the technology available for use.  Axcess Global is the exclusive licensee of ketone technology patented by the University of South Florida.  Axcess stands to profit under the license based upon sublicensing of the technology to others via the receipt of a royalty and other consideration.  After many rejected offers, Axcess found interested parties in ForeverGreen and Pruvit.  Unfortunately, after Pruvit entered into a binding contract with Axcess, and relied upon that in creating a complete company concept, Axcess sought to strike what it believed would be a more lucrative deal with ForeverGreen.  In the ultimate game of unfair competition, Axcess Global and ForeverGreen joined forced to shut Pruvit out of the market place and disparage its name to consumers.  Pruvit seeks to ability to provide its customers with the technology for which it negotiated.

## II.    Parties

2. Plaintiff: Pruvit Ventures, Inc., is a privately held Texas Corporation.  Its principal officers are located at 901 Sam Rayburn Highway, Melissa, Texas 75454.  Its registered agent for service of process is the undersigned counsel, Jenifer L. Grace.

3. Defendant Axcess Global Sciences, LLC, a Utah Limited Liability Company with is pace of business at 7810 South Prospector Drive, Salt Lake City, Utah

84121.   Defendant can be served with process via their registered agent Wasatch-IP, A Professional Corporation located at 2825 Cottonwood Parkway, STE 500, Salt Lake City UT 84121.   It is believed that the members of Axcess Global Sciences, LLC are residents of the state of Utah.

4. Defendant ForeverGreen International, LLC is a Utah Limited Liability Company with its principal place of business located at 644 North 2000 West Lindon, UT 84042.  ForeverGreen International, LLC can be served with process via their registered agent, Shane Manwaring located at 644 North 2000 West, Lindon UT 84042.   It is believed that the members of ForeverGreen International, LLC are residents of the state of Utah.

III.   ***Jurisdiction and Venue***

5. Diversity Jurisdiction. Jurisdiction before this court is proper pursuant to 28 United States Code Section 1332, which provides for diversity jurisdiction.  In this matter the parties are diverse with Pruvit being deemed a citizen of Texas while Axcess Global and ForeverGreen are deemed to be citizens of the state of Utah because it is believed that members of Defendants are residents of the state of Utah.  *See* 28 U.S.C. § 1332.  (2005).

6. Federal Question Jurisdiction. This Court also has jurisdiction in this matter pursuant to its federal question jurisdiction provided under 28 United States Code Section 1331.  Plaintiffs are being a claim for relief pursuant to 15 U.S.C. § 1125, commonly known as the Lanham Act.  Herein, Plaintiff asserts a cause of action under Section 43(a) for False Advertising.

7. Venue. Venue properly lies within this District pursuant to 28 United States Code Section 1391, wherein it provides: "A civil action may be brought in— (1) a judicial district in which any defendant resides, if all defendants are residents of the State in which the District is located." 28 U.S.C. § 1391 (2011). Subsection C provides that an entity with the capacity to sue or be sued in its common name under applicable law… shall be deemed to reside, if a defendant, in any judicial district in which the defendant is subject to the court's personal jurisdiction with respect to the civil action in question. 28 U.S.C. § 1391(c)(2) (2011). Both Defendants are subject to personal jurisdiction within the State of Texas and this District.

8. Alternatively, venue is proper under subsection (b)(2) as a substantial part of the events or omissions giving rise to the claim occurred in this judicial district. The contract at issue was negotiated within this judicial district, the parties met within this district on multiple occasions, and the sales of product originates within this district.

## IV.   *Applicable Law*

9. The breach of contract claims asserted herein shall be construed pursuant to Florida law as provided in Section 14.1 of the Sublicense agreement. However, the remaining causes of action should be construed pursuant to Texas laws.

---

ORIGINAL COMPLAINT                                                    Page 4

## V.    *Factual Background*

10.  The relationship between Terry LaCore and Ron Williams, the CEO of ForeverGreen began in approximately February 2014 after they were introduced by mutual acquaintances.  Mr. Williams traveled to Texas in early March 2014 to meet with Mr. LaCore to become acquainted.    During that visit, Mr. Williams informed Mr. LaCore about a product that he was working on involving ketosis.

11. Shortly after the meeting in Dallas, Mr. LaCore traveled to Utah to meet with Mr. Williams.

12.  Mr. LaCore again traveled to Utah on or about May 19, 2015, this time to meet with Mr. Williams as well as representatives from Axcess Global Sciences, LLC.  In attendance at the meeting were the Managing Partner of Axcess-Global, LLC Rob Rogers, Gary Millet and their attorney Charles Roberts.

13.  During the month of May 2014, Mr. LaCore, Mr. Williams and the Rob Rogers began to discuss the possibilities to bring patented ketone technology from the University of South Florida to a world-wide distribution network.  Generally the framework included a division of marketing efforts globally between ForeverGreen and another direct sales company BHIP Global, Inc.

14. During May 2014 the parties began to work together to determine if a palatable product could be formulated.  Mr. LaCore involved his manufacturing resources and attempted coordination with ForeverGreen

resources.  By late May 2014 it was believed that a product formulation has been reached as a collaboration with ForeverGreen resources and LaCore resources.   Mr. Williams represented to Mr. LaCore that he believed in the technology by the timing to utilize the product with ForeverGreen was not appropriate.

15. On June 3, 2014, as a representative of ForeverGreen, Ms. Michelle LeSuer emailed Mr. LaCore stating "Ketopia is going to be huge for *your company*, and we are excited with what we have come up with."[1]

16.  On or about June 9, 2014, Mr. LaCore began inquiring about pricing of the product developed and began communicating on a regular basis with representative from Axcess Global.

17. On June 8, 2014, attorney for Axcess Global responded to inquiries by Mr. LaCore's counsel about the agreements between Axcess Global and ForeverGreen.  In that correspondence it was represented:  "the final agreement for ForeverGreen was never executed" and that assignment to a different LaCore entity would be permissible with prior approval by Axcess Global and the University of South Florida.

18. On June 13, 2014, Axcess Global make clear that they are working to determine if BHIP Global can launch a product using the University of South Florida technology.  Mr. Millet states in an email to the undersigned that "when we were working with FG, their role was to essentially license this

---

[1] See Appendix 1 submitted herewith.  (emphasis added).

science from us and run with it.  We have not been highly involved in what they had intended to do with the product."

19. By July 3, 2014 Mr. LaCore and Mr. Williams still planned to jointly develop a product that could be distributed world-wide by both.  The vision of the parties was to work on a contract through ForeverGreen that would benefit all.[2]

20. In July 2014, Mr. LaCore had his leadership team in the Hong Kong market try the prototype product for feedback, which raised a great many questions about the technology.

21.   By July 11, 2014 negotiations between Axcess Global and ForeverGreen began to strain, and there was discussion as to whether the demand of Axcess Global were too restrictive.[3]

22.  During this time Mr. Williams and Mr. LaCore continued to jointly work with Axcess Global to determine if an agreement would be reached.

23. As relations became strained and an agreement could not be finalized, Gary Millet, on behalf of Axcess Global informed Mr. Williams and Mr. LaCore: "Based off where we stand right now we are now opening up communication with those companies [other MLM companies] again immediately.  We wish you both great success."  [4]

---

[2] See Email string of July 3, 2014 submitted herewith as Appendix 2.
[3] See Email of July 11, 2014 submitted herewith as Appendix 3.
[4] See Email of July 18, 2014 submitted herewith as Appendix 4.

24. Although both parties informed Axcess that they did not see the product being workable, Gary Millet continued to contact Mr. LaCore and his team insisting the issues with the product could be corrected and wanting a second round of samples to be tried.

25. As of July 23, 2014, Mr. Williams indicated to Mr. Rogers of Axcess Global that while he hoped that a deal could be worked out, he understood if Axcess Global needed to move forward.[5]

26. On July 28, 2014, Mr. LaCore informed Axcess Global that no agreement would be reached without market testing proving the product was not only palatable, but could also be tolerated.  This correspondence was also shared with Mr. Williams.[6]

27. Despite this, Axcess Global continued to pursue contact with Mr. LaCore and his team as well as ForeverGreen.

28. In mid-October 2014, Mr. LaCore informed Axcess Global that BHIP Global would not release the product due to the issues with the digestion and taste. Mr. LaCore informed Mr. Williams of this as well.  Mr. Williams confirmed via the telephone that he was no longer negotiating with Axcess Global for a license agreement.

29. In late October 2014, Mr. LaCore received a telephone call from Mr. Rob Rogers asking if Mr. LaCore had any contacts with someone at another direct selling company, and if he knew anyone that may be interested in the

---

[5] See Email of July 23, 2014 submitted herewith as Appendix 5.
[6] See Email of July 28, 2014 submitted herewith as Appendix  6.

technology.  Mr. Rogers confirmed with Mr. LaCore that Axcess Global was not negotiating with ForeverGreen, and did not have a contract with them.

30. Mr. LaCore referred Mr. Roger to Brian Underwood as Mr. Underwood was looking at new products to sell through a direct sales structure.

31. Mr. Underwood and Mr. Harding began negotiating with Axcess Global through Rob Rogers and Gary Millet.  On November 4, 2014, Mr. Millet provided Mr. Underwood and Mr. Harding a term sheet.[7]

32. On November 17, 2014, Axcess Global provided Pruvit Ventures, Inc. a draft license agreement.

33. In a December 12, 2014 email from Gary Millet to Brian Underwood and Chris Harding he represented:

- "USF is very willing to allow their name to be used by Pruvit provided they have the opportunity to review and approve its use.  They want to promote the patent technology."

- "We have confirmed that Dr. D'Agostino is willing to sign a contract with Pruvit."

- "We are willing to move forward on that exclusive basis"

- "Our goal is to have product in the MLM channel and we will have them ready to sell in the first quarter of 2015.  Our choice would be to finalize a deal with you."

---

[7] See Email dated November 4, 2015 submitted herewith as Appendix 7.

- "we have the patents, we have the products, we have the formulas, we have the Doctor, we have the University, we have the labs, we have the history and we[sic] the expertise and most importantly, we are ready to market now and we will."[8]

34. Due to the failure to deliver samples and a lack of ability to come to terms on a contract, Mr. Underwood informed Rob Rogers that he was declining Axcess Global's last, offer, requested a refund the product purchased or the tracking number which was consistently promised and never delivered.[9]

35. Despite the clear statement from Pruvit, Axcess Global again reached out to Pruvit saying they wanted to find a way to do business together.[10]  They further represented that USF wanted to take an equity position in Axcess Global Sciences.

36. On December 31, 2014 Axcess Global Sciences, LLC and Pruvit Ventures, Inc. entered into a Non-Exclusive Sublicense Agreement.[11]

37. There was not further indication that Mr. Williams or ForeverGreen was interested in ketosis technology until late February 2015 when Mr. Williams reached out to Mr. LaCore after having heard of Pruvit's activities in the direct sales industry with respect to a ketosis product.[12]

---

[8] See Email dated December 12, 2014 submitted herewith as Appendix 8.
[9] See Email dated December 17, 2014 submitted herewith as Appendix 9.
[10] See Email from Rob Rogers to Chris Harding submitted herewith as Appendix 9.
[11] License Agreement attached and submitted herewith as Appendix 10
[12] See Email of February 26, 2015 to Terry LaCore submitted herewith as Appendix 11.

38. As of March 2, 2015, Mr. Williams was aware that Pruvit had a contract with Axcess Global and Mr. LaCore introduced Mr. Underwood and Mr. Williams.

39. After the contract with Axcess Global and Pruvit is complete, Mr. Williams regained interested and contacted Rob Rogers with Axcess Global. Axcess Global offers to renew discussion on exclusivity with Pruvit.[13]

40. As more evidence that ForeverGreen knew that it did not have a contract with Axcess Global, it began working with Ed Porter a joint venturer for Axcess Global outside of Axcess Global's knowledge.[14]

41. On or about March 18, 215 Mr. Williams renews negotiations for access to the technology "to move forward to a product launch …. Under the terms of an old letter of intent between FG and AG."[15]

42. Relations between Axcess Global and Pruvit became strained and questions about the existence of a contract between the parties arose. Axcess Global asserted that despite all actions already made in reliance thereon, Pruvit's Sublicense agreement had not been approved by the University of South Florida.

43. Pruvit began to suspect that Axcess Global was attempting to evade the contact as they sensed the possibility they could make a better deal.

44. During the week of March 23, 2015, Mr. LaCore, the undersigned, Mr. Underwood, Mr. Williams and Mr. John Clayton met in Plano Texas to

---

[13] See email from Rob Rogers to Brian Underwood dated March 9, 2015, submitted herewith as Appendix .
[14] See Email of March 10, 2015 submitted herewith as Appendix 13.
[15] See Email dated March 18, 2015 submitted herewith as Appendix 14.

determine if a mutual relationship to develop and market ketone technology could be developed.

45. Generally, the parties agreed to work together to jointly negotiate rights that would give each access to the ketone technology license from Axcess Global.

46. On April 1, 2015, Mr. LaCore, the undersigned counsel, John Clayton, counsel for ForeverGreen and several others discussed the structure of any proposal to Axcess Global going forward.[16]

47. ForeverGreen and Pruvit began joint negotiations with Axcess Global sending Axcess Global a draft term sheet that was "for agreements for both FG and Pruvit."[17]

48. After additional negotiations between the parties, in an email dated April 10th, 2015 Mr. Williams stated informed Mr. LaCore "we probably have no deal … what we are about to do is send a legal wall n put them on there heels."

49. Further, on April 10, 2015, ForeverGreen informed Axcess Global "we have aligned with Pruvit on our relationship and can provide a powerful marketing vehicle for ketones.  Ron and Terry have worked out their differences and have aligned in a very powerful way."

50. On April 17, 2015 ForeverGreen respectfully declined the counteroffer that would have allowed all parties to work together.  Pruvit and ForeverGreen collectively determined they had no further counteroffers and would be

---

[16] See calendar invite attached submitted herewith as Appendix 15.
[17] See Email dates April 1, 2015 submitted herewith as Appendix 16.

focusing on their businesses rather than further negotiation with Axcess Global.

51. Pruvit and ForeverGreen continued discussion about the possibility of a collaborative effort.

52. In the meantime, Pruvit contacted the University of South Florida to clarify its position as to weather a sublicense for the ketone technology had been approved.  In a conversation with Donna Herber on or about April 28th, 2015 Pruvit was informed that approval of the Pruvit Sublicense agreement was provided to Axcess Global, but they did not agree to the revision of terms to the Axcess Global license agreement sought by Axcess Global.

53. Pruvit continued to attempt to work with ForeverGreen to determine is a collaborative effort between the two companies was viable.  Over a period of weeks, the parties were not able to come to an agreement, and the negotiations ended harshly.

54. On information and belief, around early June 2015 Mr. Williams and ForeverGreen renewed their contacts with Axcess Global.

55. On June 10, 2015, counsel for ForeverGreen asserted that ForeverGreen Internation LLC holds worldwide exclusive licenses to the patents and technology.

56.  ForeverGreen also asserted that is has the exclusive rights to utilize "the name and likeness of the University of South Florida and the name and likeness of Dominic P. D'Agostino, PHD

57. These false assertion was made with full knowledge that Pruvit held a sublicense agreement for the territories of United States and Canada.

58. Further, ForeverGreen's assertions regarding the rights to Dr. D'Agostino were false.

59. Axcess with the assistance of ForeverGreen undertook to create a subterfuge in order to enter into what they perceive to be a more profitable agreement and manufacture a reason to wrongfully terminate the sublicense of Pruvit.

## VI.    *Causes of Action Against Axcess Global, Inc.*

### a.  **Breach of Non-Exclusive Sublicense Agreement**.

60. To recover on a claim of breach of contract under laws of the State of Florida, a Plaintiff must show:   (1) a valid contract, (2) a material breach, and (3) damages.  *See Friedman v. New York Life Ins. Co.*, 985 So. 2d 56 (2008).

61. Pruvit and Axcess entered into a Non-Exclusive Sublicense Agreement effective December 31, 2014 ("Agreement").  The Agreement provided in part that Pruvit had a non-exclusive royalty bearing license to the Licensed Field and Licensed Territory to:  "Make, have made, develop, used, lease, import, export, offer to sell, sell, and have sold Licensed Products and/or Licensed Processes."

62. Licensed Field under the Agreement is defined as "the field of product for human consumption with the exception of pharmaceuticals in the Multi-level Marketing Channel."

63. Licensed Territories under the agreement are defined as the United States and Canada.

64. Licensed Product and Licensed Process means: any product that is: (1) covered in whole or in part, (2) manufactured by using a process that is covered in whole or in part, (3) incorporates, utilizes or was developed utilizing Know-How or that is manufactured using Know-How that is covered by an issued, unexpired claim or pending claim contained in the Licensed Patents.

65. After the agreement was signed and Axcess Global represented that it was agreed to by the University of South Florida, Pruvit in reliance thereon undertook to develop products utilizing the Licensed Patents.

66. The Licensed Patents included the patent with provisional patent Nos. 61/803,203 and 61/926,664.

67. Patents 61/803,203 and 61/926,664 related to the use of ketogenic precursors (medium chain triglycerides and mineral salts of beta-hydroxybutyrate) to quickly elevate and sustain levels of ketone bodies in the blood to assist the body's transition into nutritional ketosis.

68. The Licensed Patents further provide that metabolism of ketone bodies is associated with anticonvulsant effects, enhanced brain metabolism, improvement in cognitive and physical performance. Ketone supplementation is also associated with beneficial impacts on physical, cognitive health, psychological health, warfighter resilience and a long-term

impact on health with respect to common avoidable diseases such as obesity, neurodegenerative diseases, diabetes and cancer.

69. Pruvit was to receive a single serve powder formula utilizing the Licensed Technology within five days of the signing of the agreement. Pruvit did not receive a formula that utilized the Licensed Technology within the time period agreed.

70. Axcess Global, then also breached the Agreement by failing to adequately license the Technology to Pruvit, and thereafter licensing the Technology to ForeverGreen for use within the Licensed Territories.

71. While disputing the existence of the contract, Axcess wrongfully sent a notice of termination to Pruvit, and embroiled themselves in a subterfuge between Pruvit and ForeverGreen.

72. Pruvit has expended considerable resources to utilize the technology licensed. Such resources are monetary and equitable in nature. Pruvit been damages as a result of the loss of rights under the license agreement and wrongful termination. Monetary damages are likely to exceed $3,000,000 in damages.

b. **Fraud**

73. In Texas, the elements of Common Law Fraud are: (1) a material representation was made; (2) the representation was false; (3) when the representation was made, the speaker knew it was false, or made it recklessly without any knowledge of the truth and as a positive assertion; (4) the speaker made the representation with the intent that the other party

should act upon it; (5) the party acted in reliance on the representations; and (6) the party thereby suffered injury. *In re First Merit Bank, N.A.*, 52 S.W.2d 749,758 (Tex.2001).

74. Axcess Global committed Fraud by misrepresenting the status of negotiations with ForeverGreen, and the nature of its relationship with ForeverGreen.

75. Axcess, through its agent Rob Rogers misrepresented in a meeting in late 2014 between he and Brian Underwood of Pruvit in Dallas that all negotiations with ForeverGreen had ceased, and Axcess had the authority to License the Products and Processes in the Licensed Territory.

76. Axcess in emails from Gary Millet to Brian Underwood and others also falsely represented the nature of the Licensed Patents included the right associate nutritional ketosis with the possibility of weight loss.

c. **Unfair Competition—Lanham Act Violations**

77. Section 1125 of United State Code Chapter 15 provides:

(a) Civil Action.

> (1) Any person who on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact which –
>> a. is likely to cause confusion or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, as to the origin sponsorship, or approval of his or her goods, services, or commercial activities by another person; or

b. in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is likely to be damages by such act.

15 USC §1125(a).

78. Axcess Global has violated the Lanham Act by among other things:

a. Representing on its company motor home that it is the "only" product on the market to create instant ketosis;
b. That Kegenix is the first product of its kind to provide exogenous ketones into human nutrition;
c. Falsely Marketed a product asserting that is was endorsed by Dr. D'Agostino;
d. Falsely representing that their power product will induce ketosis instantly.
e. Falsely representing the quality of its ingredients to consumers.

d. **Promissory Estoppel  (pleaded in the alternative)**

79. Pleading in the alternative to its Breach of Contract cause of action, Plaintiff pleads that it is entitled to Promissory Estoppel.  To establish promissory estoppel, Plaintiff must show:  (1) Axcess made a promise to Pruvit; (2) Pruvit reasonably and substantially relied upon the promise to its detriment; (3) Pruvit's reliance was foreseen by Axcess; and (4) injustice can be avoided only by enforcing the promise of Axcess Global.

80. Axcess promised to Pruvit that it had the right to license the USF technology and that the technology was significant to the general public as a result of its properties with respect to a weight loss campaign.

81. Pruvit relied on the promise of Axcess about the nature of the Licensed Patents and that it would not undermine Pruvit's ability to utilize those patents.

82. Pruvit relied upon the promises of Axcess Global to its detriment in that it has spent countless hours and monetary resources developing a product and marketing strategy to sell the product.  Pruvit proceeded with the belief that its development would not undermined by other parties.

## VII.   *Causes of Action Against Forever Green International, Inc.*

### a.  **Fraud**

83. In Texas, the elements of Common Law Fraud are:  (1) a material representation was made; (2) the representation was false; (3) when the representation was made, the speaker knew it was false, or made it recklessly without any knowledge of the truth and as a positive assertion; (4) the speaker made the representation with the intent that the other party should act upon it; (5) the party acted in reliance on the representations; and (6) the party thereby suffered injury.  *In re First Merit Bank, N.A.*, 52 S.W.2d 749,758 (Tex.2001).

84. ForeverGreen committed fraud by failing to disclose that it was negotiating with Axcess Global to attempt an exclusive license inspite of its knowledge that Pruvit had a binding contract with Axcess Global.

85.  ForeverGreen's actions to obtain an exclusive license to the detriment of Pruvit were done with actual knowledge and with malice.

---

b. **Business Disparagement**

34.    ForeverGreen published disparaging comments about Pruvt and its rights to the Licensed Technology and Plaintiff's economic interests and ability to provide the technology to its sales force.

35.    ForeverGreen's statements about its access to the patent inventor and the exclusivity of its rights as opposed to those of Pruvit are false and were published with malice.  The false statements were repeated online and through various media without a privilege to do so.

36.    Publication of ForeverGreen's false statements caused Pruvit special damages.

c. **Tortious Interference with Non-Exclusive Sublicense Agreement.**

86. Forever Green was well aware that Pruvit had a valid and existing contract with Axcess.

87. Forever Green willfully interfered with that contract and encouraged Axcess to wrongfully terminate its contract with Axcess so that it could obtain rights that are lawfully those of Pruvit.

88. Forever Green then undertook to assert that Pruvit did not have rights to the Licensed Technology that Forever Green was fully aware were their rights. With the misrepresentations about the rights of Pruvit, ForeverGreen undertook a pattern and practice of disparagement.

89. ForeverGreen's interference with the contract between Pruvit and Axcess has caused Pruvit substantial harm and monetary damages.

### d. **Lanham Act Violations—Unfair Competition**

90. The ForeverGreen made a false or at the very least a misleading statement of fact in advertising regarding is exclusive rights to the licensed technology and endorsement of its product by the patent author;

91. The false statement deceived or had the capacity to deceive a substantial segment of the audience to which it was directed;

92. This deception was material, in that it was likely to influence the purchasing decision of ForeverGreen and Pruvit customers;

93. ForeverGreen is a known international company with business in the United Stated and has caused its goods to enter interstate commerce;

94. ForeverGreen Violated the Lanham Act by at a minimum falsely representing the following:

   a. It has exclusive rights to the use of the image of Dr. D'Agostino

   b. Dr. D'agostino approved and/or endorsed the ketopia product;

   c. It has exclusive world-wide rights to ketone technologies under the patents;

   d. It has the exclusive supply of BHB salts world-wide;

   e. It is able to promptly deliver orders to customers within a specified period of time, yet many products remain undelivered;

   f. That the ketopia product would induce nutritional ketosis;

   g. The ingredients of the ketopia product are what they are stated to be on the label;

---

95. Plaintiff has been injured as a result of ForeverGreen's false statements.

## VIII.  *Trial by Jury Requested.*

**96.** Plaintiff seeks a trial by jury on all issues triable to a jury.

## IX.  *Relief Requested*

For the above states reasons, Plaintiff respectfully requests that Defendants be cited to appear and that Plaintiff be awarded a judgment against Defendants jointly and severally for the following:

1.  Monetary Damages

    a.  Disgorgement of Profts

    b.  Expectancy Damages

    c.  Reliance Damages

    d.  Lost Profits

    e.  Loss of Credit

    f.  Loss of Goodwill

    g.  Exemplary Damages

    h.  Court Costs

    i.  Attorneys' Fees

2.  Equitable Damages

    a.  Specific Performance of the Non-Exclusive Sublicense Agreement

Respectfully submitted,

/s/ Jenifer L. Grace____
**JENIFER L. GRACE**
State Bar No. 24026777
Attorney-in-Charge
The Grace Firm, PLLC
901 Sam Rayburn Highway
Melissa, Texas 75434
(972) 439-1750        Telephone
(800) 335-2901        Facsimile
jenifer.grace@gracefirm.com
**ATTORNEY FOR PLAINTIFF**

## CERTIFICATE OF SERVICE

I, Jenifer Grace, affirm that on this 8th day of October, 2015, I served all counsel of record via the electronic filing system in accordance with the Federal Rules of Civil Procedure and the Electronic Filing Rules.


/s/  Jenifer Grace