# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

| | |
|---|---|
| PRUVIT VENTURES, INC., | Civil Action No. 4:15-cv-00571-ALM-CAN |
| Plaintiff, | |
| vs. | **EMERGENCY JOINT MOTION FOR TEMPORARY RESTRAINING ORDER, EXPEDITED DISCOVERY, AND PRELIMINARY INJUNCTION BY GLOBAL SCIENCES, LLC AND FOREVERGREEN INTERNATIONAL, LLC; MEMORANDUM IN SUPPORT THEREOF** |
| AXCESS GLOBAL SCIENCES, LLC, and FOREVERGREEN INTERNATIONAL, LLC, | |
| Defendants. | |
| FOREVERGREEN INTERNATIONAL, LLC | |
| Counterclaimant, | Honorable Judge Amos L. Mazzant |
| vs. | |
| PRUVIT VENTURES, INC., LACORE LABS, LLC, TERRY LACORE, BRIAN UNDERWOOD, CHRISTOPHER N. HARDING, BILLY FUNK, RAY DIETRICH, ROBERT DEBOER, and MICHAEL RUTHERFORD, | |
| Counterclaim and Third-Party Defendants. | |
| AND RELATED COUNTERCLAIMS AND THIRD-PARTY CLAIMS | |

## TABLE OF CONTENTS

Page

I.      INTRODUCTION ........................................................................................................1

II.     FACTUAL BACKGROUND ......................................................................................5

        A.      AGS and ForeverGreen's Innovative Technology ..................................5

        B.      Early Meetings with Axcess Global and ForeverGreen ..........................7

        C.      ForeverGreen's Introduction to Terry LaCore (Pruvit) ..........................7

        D.      AGS's Failed Licensing Venture with Pruvit ...........................................9

        E.      Pruvit's   Misappropriation   of   AGS's   Trade   Secrets   and   Patent
                Infringement ...............................................................................................13

        F.      AGS's Partnership with ForeverGreen ....................................................14

III.    STATEMENT OF ISSUES ......................................................................................14

IV.     ARGUMENT ............................................................................................................15

        A.      The Court Should Order a Temporary Restraining Order and Preliminary
                Injunction to Mitigate Damages Resulting from Pruvit's Misappropriation
                of Trade Secrets and Patent Infringement ...............................................15

                1.      AGS has a substantial likelihood of success on the merits of its
                        claim that Pruvit misappropriated its trade secrets. ...................16

                2.      AGS and ForeverGreen have a established reasonable likelihood of
                        success on their claims for patent infringement against Pruvit ..............22

                3.      AGS and ForeverGreen have suffered, and continue to suffer,
                        irreparable injury as a result of Pruvit's misappropriation of AGS's
                        trade secrets and patent infringement. .......................................32

                4.      The balance of the harms favor AGS and ForeverGreen. .........................39

                5.      The public interest will be best served by granting this Motion. ...............40

B.      To the Extent Further Evidence is Necessary to Support a Preliminary
          Injunction, the Court Should Grant the Request for Expedited Discovery
          Because it is Reasonable in Light of the Circumstances. ......................................41

V.      CONCLUSION............................................................................................................43

**TABLE OF AUTHORITIES**

Page(s)

**Cases**

*Abbott Labs. v. Sandoz, Inc.*,
    544 F.3d 1341 (Fed. Cir. 2008)................................................................34

*Akamai Techs., Inc. v. Limelight Networks, Inc.*,
    797 F.3d 1020 (Fed. Cir. 2015)................................................................24

*Alexam, Inc. v. Best Buy Co.*,
    No. 2:10CV93, 2012 WL 1188406 (E.D. Tex. Apr. 9, 2012) ................................23

*Am. Exp. Fin. Advisors, Inc. v. Scott*,
    955 F. Supp. 688 (N.D. Tex. 1996) ........................................................33

*In re Associated Indep. Marketers Inc. of Am.*,
    1 F.3d 1237 (5th Cir. 1993) ................................................................18

*Combat Zone Corp. v. John/Jane Does 1-2*,
    No. 2:12-CV-00509, 2012 WL 6684711 (E.D. Tex. Dec. 21, 2012) ......................43

*Commil USA, LLC v. Cisco Sys.*,
    135 S.Ct. 1920 (2015)......................................................................24

*Daniels Health Sciences, L.L.C. v. Vascular Health Sciences, L.L.C.*,
    710 F.3d 579 (5th Cir. 2013) .......................................................... *passim*

*El Pollo Loco, S.A. de C.V. v. El Pollo Loco, Inc.*,
    344 F.Supp.2d 986 (S.D. Tex. 2004) ......................................................43

*Eli Lilly & Co. v. Premo Pharm. Labs., Inc.*,
    630 F.2d 120 (3d Cir. 1980)................................................................41

*Genentech, Inc. v. Novo Nordisk A/S*,
    108 F.3d 1361 (Fed. Cir. 1997)..........................................................23, 32

*Golden Hour Data Sys. v. emsCharts, Inc*,
    No. 2:06-CV-381, U.S. Dist. LEXIS 95640 (E.D. Tex. Mar. 31, 2014) .................33

*Hybritech Inc. v. Abbott Labs.*,
    849 F.2d 1446 (Fed. Cir. 1988)........................................................16, 34

iv

*Indus. Insulation Grp., LLC v. Sproule*,
    613 F. Supp. 2d 844 (S.D. Tex. 2009) ..................................................................18

*Jack Guttman, Inc. v. Kopykake Enterprises, Inc.*,
    302 F.3d 1352 (Fed. Cir. 2002)..................................................................23, 32

*Khan v. Fort Bend Indep. Sch. Dist.*,
    561 F. Supp. 2d 760 (S.D. Tex. 2008) ..................................................................16

*Markman v. Westview Instruments, Inc.*,
    52 F.3d 967 (Fed. Cir. 1995)..................................................................23

*Microsoft Corp. v. i4i Ltd.*,
    131 S. Ct. 2238 (2011)..................................................................32

*Petro Franchise Sys., LLC v. All Am. Properties, Inc.*,
    607 F. Supp. 2d 781 (W.D. Tex. 2009)..................................................................21, 22

*Pfizer, Inc. v. Teva Pharm., USA, Inc.*,
    429 F.3d 1364 (Fed. Cir. 2005)..................................................................35, 40, 41

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005)..................................................................24, 28

*Picker Int'l, Inc. v. Blanton*,
    756 F. Supp. 971 (N.D. Tex. 1990) ..................................................................41

*Reebok Int'l Ltd. v. J. Baker, Inc.*,
    32 F.3d 1552 (Fed. Cir. 1994)..................................................................34

*Revision Military, Inc. v. Balboa Mfg. Co.*,
    700 F.3d 524 (Fed. Cir. 2012)..................................................................16, 17

*St. Louis Grp., Inc. v. Metals & Additives Corp.*,
    275 F.R.D. 236 (S.D. Tex. 2011)..................................................................42, 43

*Vehicular Technologies Corp. v. Titan Wheel Int'l, Inc.*,
    141 F.3d 1084 (Fed. Cir. 1998)..................................................................23

**Rules**

Federal Rules of Civil Procedure Rule 26 ..................................................................1

**Statutes**

35 U.S.C. § 271 ...................................................................................................23, 24

35 U.S.C. § 282 ........................................................................................................32

35 U.S.C. § 283 ..........................................................................................................1

# MOTION

Defendants and counterclaimants Axcess Global Sciences, LLC ("AGS") and ForeverGreen International, LLC ("ForeverGreen") (AGS and ForeverGreen are collectively referred to as "Counterclaimants") move the Court to enter a temporary restraining order and preliminary injunction against plaintiff and counterdefendants Pruvit Ventures, Inc. ("Pruvit"), LaCore Labs, LLC, Terry LaCore ("LaCore"), Brian Underwood ("Underwood"), Christopher N. Harding ("Harding"), Billy Funk ("Funk"), Ray Dietrich ("Dietrich"), Robert Deboer ("Deboer"), and Michael Rutherford ("Rutherford") pursuant to Rule 65 of the Federal Rules of Civil Procedure ("Rule[s]"), and 35 U.S.C. § 283. Furthermore, to the extent necessary, Counterclaimants move the Court to compel expedited discovery pursuant to Rule 26(d)(1) to allow them access to the precise formula being used in Pruvit's product.  Counterclaimants also submit herewith a "[Proposed] Order Granting Defendants Axcess Global Sciences, LLC And ForeverGreen International, LLC's Joint Motion For a Temporary Restraining Order and Expedited Discovery, and Setting Preliminary Injunction Hearing."  Counterclaimants respectfully request an oral hearing on this motion to allow them a full opportunity to present their arguments before the Court.

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

Over the past three years, AGS and ForeverGreen have been working together to bring a revolutionary new technology to the weight management industry. (Williams Decl. at ¶¶13-15.) Through extensive research and development, and utilizing their exclusive rights to patented technology, AGS and ForeverGreen created a dietary supplement now sold by ForeverGreen

1

called "KetonX," a product that rapidly places a user's body in a state of nutritional ketosis. (*Id.* at ¶ 8.) Nutritional ketosis is a natural metabolic state where the body burns fat, rather than glucose from carbohydrates for most of its energy. (*Id.* at ¶ 7; Millet Decl., Ex. B at 2:37-42.) Typically, without several days of fasting, extreme exercise, or adhering to unrealistic diets, humans cannot enter a state of ketosis. (Millet Decl., Ex. A at 2:14-24.) For these reasons, until recently, nutritional ketosis has been out of reach for the average person. (*Id.* at ¶ 7.) AGS and ForeverGreen's technology changes that.

ForeverGreen's KetonX supplement helps users achieve a state of nutritional ketosis without the necessity of long periods of fasting or vigorous exercise. (*Id.* at ¶ 8.) By using KetonX, a person can achieve a state of ketosis within an hour. (*Id.*) Because of this benefit, KetonX is revolutionizing the weight management industry. (*Id.* at ¶¶ 9-12.) KetonX utilizes technology described in United States Patent Nos. 6,613,356 ("Vlahakos Patent") and 9,138,420 ("USF Patent") (collectively, the "Asserted Patents"), to which Counterclaimants possess licenses. (Millet Decl. ¶¶ 4-7; Williams Decl., Exs. A & K.) The Vlahakos Patent relates to use of butyrate salts in a dietary supplement to achieve weight loss by means of appetite suppression. (Millet Decl., Ex. A at 1.) The USF Patent relates to a composition composed of butyrate salts in combination with medium chain fatty acids to induce a state of ketosis. (Millet Decl., Ex. B at 1.)

Axcess Global first approached ForeverGreen to jointly develop a Ketosis Supplement in early 2013 and the parties signed a Letter of Intent regarding the same on February 6, 2014. (Williams Decl. at ¶ 14.) Over the next several months, despite extensive time and money expended on research, product development, and testing to perfect its formulations (proprietary knowledge related to Ketosis Supplement development and formulations hereinafter "Know-

How"), Axcess Global struggled to produce a supplement that was ready for marketing. (Millet Decl. at ¶ 10; Williams Decl. at ¶ 15.)

Shortly thereafter, ForeverGreen's CEO Ron Williams ("Williams") was introduced to LaCore (later a co-founder of Pruvit), who represented himself as a colleague and a friend. (Williams Decl. at ¶ 16.) Williams introduced LaCore to Ketosis Supplements and explored the possibility of having LaCore do some product testing on early versions of KetonX in China. (*Id.* at ¶¶ 16-17.) LaCore agreed to test the product, but toward the end of 2014, LaCore informed Williams that he was no longer interested in working together and that he intended to develop a Ketosis Supplement under the name Pruvit Ventures, Inc. (Williams Decl. at ¶ 18-19.)

After being introduced to AGS by ForeverGreen, Pruvit's founders signed a sub-license agreement with AGS (the "Pruvit Sublicense") pending approval of USF.  (Millet Decl. at ¶ 25.) However, USF never approved the sub-license.  (Millet Decl., Ex. D.) In an effort to help Pruvit recoup its investment in the technology, ForeverGreen negotiated extensively with Pruvit to joint venture on a product launch.

Despite being introduced to the Ketosis Supplement technology by ForeverGreen, and ForeverGreen's efforts to work with Pruvit to bring a product to market, Pruvit surreptitiously abandoned these efforts and rushed forward alone in an effort to be first to market with its own Ketosis Supplement. (Williams Decl. at ¶ 24.) On May 12, 2015,  without permission from AGS or ForeverGreen, without license to the USF Patent or the Vlahakos Patent, and through misappropriation of proprietary information, Pruvit launched a Ketosis Supplement, dubbed

"KETO//OS."[1]  In order to conduct its product launch, Pruvit misappropriated AGS's trade secrets and infringed upon ForeverGreen and AGS's rights under the Asserted Patents in the process. (Williams Decl. at ¶¶ 24-25.) Pruvit's launch occurred a full two months before ForeverGreen made it to market with KetonX. (*Id.* at ¶¶ 25-26.)

Pruvit's KETO//OS supplement improperly and illegally competes directly with ForeverGreen's KetonX supplement in the marketplace. Despite known issues with side effects associated with KETO//OS (e.g., headaches, diarrhea, and nervous system issues), KETO//OS and KetonX are seen as alternatives to each other, with each product being used as a ketosis weight management supplement. (*Id.* at ¶¶ 38-41.) As a result, KETO//OS is improperly tarnishing the industry and tainting the market for Ketosis Supplements that rightfully belongs to AGS and ForeverGreen. (*Id.*) Furthermore, Pruvit currently offers the infringing KETO//OS to its distributors at up to a 32% discount when compared to the properly licensed KetonX product, causing price erosion and substantial irreparable harm to Counterclaimants. (*Id.* at ¶ 35.)

If Pruvit is allowed to discount its product, infringe the Asserted Patents, and misappropriate AGS's trade secrets, ForeverGreen will have no choice but to lower its price to be competitive with the infringing Pruvit product. (*Id.* at ¶¶ 35-36.) Once this price erosion has occurred, ForeverGreen will not be able to increase its price. (*Id.*) Additionally, by virtue of being first to market, Pruvit improperly usurped the benefit of initial interest among distributors in the network marketing industry and diverted distributors that were already associated with ForeverGreen and others that would likely have otherwise joined ForeverGreen. (*Id.* at ¶ 28.)

---

[1] A companion product, called "KETO//COS," which includes caffeine, was also launched.  Both products are referenced herein as merely "KETO//OS."

The loss of distributors is particularly harmful in the network marketing industry because loss of high level distributors often results in loss of their entire downline as well.[2] (Williams Decl. at ¶ 43.) These harms to ForeverGreen are far reaching, severe and irreparable. (*Id.*)

Because ForeverGreen is being irreparably harmed, and because AGS and ForeverGreen are likely to succeed on their claims of patent infringement and misappropriation of trade secrets, the Court should grant this Motion, issue a temporary restraining order against Pruvit, order limited expedited discovery,[3] and set a hearing and briefing schedule for preliminary injunction to prevent Pruvit from further infringing conduct.

## II.    FACTUAL BACKGROUND

### A.  AGS and ForeverGreen's Innovative Technology

Statistical reports indicate that 50% of all American adults are overweight. (Millet Decl., Ex. A at 1:22-24.) During the past five decades, several medications have been tried with patients to reduce weight. (*Id.*)  Many exercise routines and dietary plans have been developed in an effort to combat this obesity epidemic and to help people achieve their weight-management goals.  (*Id.* at 1:46-48.)

---

[2] In direct selling networks, distributors are compensated not only for the sales they generate, but also for the product sales of the other distributers that they introduce to the company's products lines. This introduction of customers and other distributors is referred to as a distributor's "downline." Because each distributor can introduce several additional distributors and customers at the level below her, growth in a healthy direct selling network can be exponential. Similarly, loss of a single high level distributor can have a devastating effect because it typically results in migration of an entire downline.

[3] The requested expedited discovery will likely bring evidence to light that will bring quick resolution to this matter and an end to the irreparable harm being inflicted upon ForeverGreen and AGS by Pruvit's wrongful acts.

One weight management technique focuses on helping people reach a state of nutritional ketosis through diet and exercise. (*See generally* Millet Decl., Exs. A and B.) A state of nutritional ketosis is typically achieved by undertaking long periods of fasting or extended exercise. (Millet Decl., Ex. A at 2:14-28.) Once nutritional ketosis is achieved, a person's body begins burning fat and using ketone bodies as an alternative source of energy, rather than glucose. (*Id*. at 2:37-42.) When in ketosis, the body essentially burns fat for fuel rather than carbohydrates, resulting in a reduction of fat stores and weight loss. (*Id*.) However, due to the physical demand associated with long periods of fasting and extended exercise, achieving a state of nutritional ketosis is extremely challenging, if not impossible, for most people. (*Id*. at 4:18-20.)

Recently, however, technology has been developed whereby a state of ketosis can be achieved, without the necessity of extended fasting or vigorous exercise, through ingestion of ketone based dietary supplements. (*See generally* Millet Decl., Ex. B.) The appetite suppressant effects of beta-hydroxybutyrate and its related salt for facilitating weight loss were first described and patented by Dr. Victor Vlahakos in the Vlahakos Patent. (*See* Millet Decl., Ex. A.) Later, researchers at the University of South Florida discovered that combining a medium chain fatty acid with beta-hydroxybutyrate salts would produce elevated and sustained ketosis. (*See* Millet Decl. Ex. B.) They filed for, and were awarded a U.S. patent for this discovery. (*Id*.) As described below, it is necessary to practice both of these patents to sell Pruvit's ketosis supplement and make the associated weight loss claims.

### B.  Early Meetings with Axcess Global and ForeverGreen

Having secured rights to the Asserted Patents, Axcess Global decided to develop a product based on the Asserted Patents (a "Ketosis Supplement") and find a network marketing company to introduce the product in that channel. In early 2013, while working with a consultant, Axcess Global was given a list of network marketing companies, including ForeverGreen, as candidates to consider as sublicensing partners for rights in the technology claimed in the Asserted Patents. (Millet Decl. at 9; Williams Decl. at ¶ 13.) Near the end of 2013 Axcess Global decided that it would partner with ForeverGreen to bring a Ketosis Supplement to the network marketing industry. The parties signed a Letter of Intent on February 6, 2014 (before any deal with Pruvit). (Millet Decl. at ¶ 10; Williams Decl. at ¶ 14.) Over the next several months, despite extensive research, development, and testing, Axcess Global struggled to produce a supplement that was ready for marketing. (Millet Decl. at ¶ 10; Williams Decl. at ¶ 15.)

### C.  ForeverGreen's Introduction to Terry LaCore (Pruvit)

During this research and development period, in early in 2014, Williams (ForeverGreen) was introduced to LaCore (Pruvit), who represented himself as a friendly colleague. (Williams Decl. at ¶ 16.) LaCore had an established network marketing company, bHIP Global ("bHIP"), and he and Williams discussed the possibility of licensing bHIP for distribution of a Ketosis Supplement in the network marketing channel in China, where bHIP was prevalent, with ForeverGreen maintaining rights in the remainder of the network marketing channel world-wide. (*Id.* at ¶ 17.)

Early in 2014, Williams introduced Axcess Global to counter-defendant LaCore. (Millet Decl. at ¶ 11; Williams Decl. at ¶ 16.) Axcess Global understood that the introduction was to allow LaCore's company, bHIP to work with ForeverGreen to market and sell a Ketosis Supplement. As part of these conversations, ForeverGreen, Axcess Global, and LaCore discussed the possibility of licensing LaCore's company for distribution of a Ketosis Supplement in China, and later expanded those discussions to address other countries in Asia. (Millet Decl. at ¶ 11.)

During this time, AGS and ForeverGreen began testing their initial formulations of a Ketosis Supplement. (Williams Decl. at ¶ 18.) Eventually, Williams asked LaCore if he would be willing to test an early version of ForeverGreen's Ketosis Supplement in China. (*Id.*) LaCore agreed to do so and ForeverGreen and LaCore both began testing the product. (*Id.*) Unfortunately, as evidenced in both ForeverGreen and LaCore's initial tests, this early formulation was not ready for market. (*Id.*)

Toward the end of 2014, Williams received a phone call from LaCore who indicated that he was no longer interested in partnering with ForeverGreen, that he did not believe the University of South Florida's patent application[4] would ever result in an issued United States Patent, and that he intended to move forward and develop a ketosis supplement on his own under the Pruvit name. (*Id.* at ¶ 19.) Williams asked LaCore not to pursue a Ketosis Supplement on his own and indicated that it was clear that this was not Williams' intent when he introduced LaCore to the proprietary ketosis technology. (*Id.*)

---

[4] The referenced application eventually issued and became United States Patent No. 9,138,420.

### D.  AGS's Failed Licensing Venture with Pruvit

In about October of 2014, LaCore introduced Axcess Global to Underwood and Harding and independent discussions began with defendants LaCore, Underwood, and Harding about licensing the Asserted Patents and introducing a Ketosis Supplement through a network marketing company they would form together. (Millet Decl. at ¶ 12.) That company later was formed as Pruvit. (*Id.*) In connection with these discussions, Underwood signed a non-disclosure agreement with Axcess Global (Millet Decl., Ex. C), which he later breached (see AGS's Answer and Counterclaims at p. 31, filed concurrently herewith.)

During this time, as a result of significant expenditure of time and resources, AGS developed certain Know-How related to formulation and production of Ketosis Supplements that incorporate the patented technology. (Millet Decl. at ¶ 14.)  Essentially, the "Know-How" was the perfection of a formulation for Ketosis Supplements.

Around this time, the principals at Axcess Global formed AGS for the purpose of commercializing the ketone technology, including products covered by the Asserted Patents. On November 7, 2014, AGS signed a non-binding Term Sheet with Pruvit (the "Pruvit Term Sheet") [5] that expressed the parties' non-binding intentions that AGS would license its patent rights and trade secrets,[6] including the Vlahakos Patent and the USF Patent, to Pruvit for use in network marketing channels.  (Millet Decl. at ¶¶ 14-15; s*ee also* Ex. E to Axcess Global Sciences, LLC's

---

[5] The actual parties to the Pruvit Term Sheet are AGS and "NEWCO Inc." which later became Pruvit Ventures, Inc.

[6] Under the Pruvit Term Sheet, AGS's trade secrets include Know-How related to formulations for manufacturing Ketosis Supplements.

Motion for Judgment on the Pleadings Under Rules 9(b) and 12(c) filed concurrently herewith.) The Pruvit Term Sheet included a binding confidentiality provision stating that no "information disclosed by Axcess to [Pruvit][may] be disclosed publicly or privately by [Pruvit], except with the written consent of Axcess or as otherwise required by law."  (*Id.*; *see* AGS's Answer and Counterclaims at p. 31, filed concurrently herewith.)

After executing the Pruvit Term Sheet, AGS and Pruvit continued negotiating a business relationship that would allow Pruvit to launch a Ketosis Supplement. (Millet Decl. at ¶ 16.) On December 31, 2014, Axcess Global and Pruvit signed a "Non-exclusive Sublicense Agreement" (the "Pruvit Sublicense"), which included provisions for the licensing of the USF Patent. (*Id.* at ¶ 16.) Despite clear knowledge of the Vlahakos Patent, Pruvit elected not to obtain a license to it. (*Id.*; *see also* Millet Decl., Ex. D.)

The Pruvit Sublicense also included a confidentiality provision requiring Pruvit to maintain all AGS confidential information in confidence and only use it to carry out the terms and objectives of the Pruvit Sublicense.  (Millet Decl., Ex. D at § 18.) Pursuant to this agreement, AGS disclosed its Know-How, including its proprietary formulations, to Pruvit to facilitate Pruvit's development of a product that incorporated the technology disclosed and claimed in the USF Patent. (Millet Decl. at ¶ 18.) The Know-How provision of the Pruvit Sublicense reads in relevant part as follows:

> "'Know-How' means technology and/or information that was developed by [the Inventors of the USF Patent] or [AGS], including without limitation the

information listed in **Appendix A**,[7] methods, processes, techniques, compounds, cell lines, materials, sequences, drawings, indications, data, results of tests, or studies, plans, and expertise, whether patentable or not, which relates specifically to or supports the Licensed Patents[8] and existing on or after September 4, 2013, only to the extent wholly owned and controlled by USF or [AGS], except that Know-How shall not include the Licensed Patents. . . . "[Pruvit] acknowledges that [AGS's] formulations are confidential and proprietary trade secrets and Know-How of [AGS] and that all information pertaining to such trade secrets will be treated as Confidential Information under this Agreement . . .

(Millet Decl., Ex. D at § 1.12.)

Another critically important section of the Pruvit Sublicense states a condition precedent to establishment of any Pruvit right as follows: "this document shall become effective and binding only upon the execution by duly authorized representatives of both Licensee and Licensor and approved by USF."  (Millet Decl., Ex. D at § 16.) However, the Pruvit Sublicense was never effective and binding, having failed to satisfy the condition precedent of being signed and approved by USF. (*Id.* at p. 18.) Therefore, Pruvit never had any rights to use the proprietary formulations, and Pruvit failed to obtain any rights necessary under the USF Patent to make or sell the KETO//OS product.  (*See* Concurrently Filed Motion for Summary Adjudication filed by AGS, *et al*.)

---

[7] The information listed in Appendix A includes proprietary "formulations, biochemical data supporting the formulations, dosing regimens, schedules, quantities, and new formulations developed for [Pruvit]." (Millet Decl., Ex. D at Ex. A.)

[8] For purposes of this Motion, it is sufficient to know that the "Licensed Patents" includes the USF Patent. (Millet Decl., Ex. D at §1.6.)

In addition, even if the Pruvit Sublicense had become effective, which it did not,[9] Pruvit breached the agreement and forfeited any alleged rights under the Pruvit Sublicense based upon its failure to obtain adequate insurance, an act that placed AGS at significant risk. (Millet Decl. at ¶ 24.) Section 9.3 provides: "Licensor may terminate this Agreement if (a) Licensee … is in breach of any provision. …  Termination under this Section 9.3 will take effect thirty (30) days after written notice by Licensor, unless Licensee remedies the problem in that 30-day period." (Millet Decl., Ex. D.) When Pruvit failed to cure its breach within the 30-day cure period, any alleged rights arising out of the alleged Pruvit Sublicense would have terminated by operation of the express terms of the contract. (Millet Decl. at ¶ 27.)

Even though Pruvit was in breach, and notwithstanding the fact that USF never signed the Pruvit Sublicense, on May 12, 2015, Pruvit moved forward with a nationwide launch of its product, KETO//OS, thereby misappropriating AGS's proprietary formulations (i.e., AGS's trade secret Know-How) and infringing the Asserted Patents and causing irreparable harm to Counterclaimants. (Millet Decl. at ¶ 25.)

By letter dated May 14, 2015, AGS gave Pruvit formal notice of its breach of Section 12.2 of the Pruvit Sublicense, which states in part:

> Licensee warrants that it now maintains and will continue to maintain liability insurance coverage [of no] less than $3 million in the aggregate, $1 million per occurrence, and that such insurance coverage lists Licensor and its affiliates, USF, its Affiliates, its Trustees, the Florida Board of Governors, and the inventors of the Licensed Patents as additional insureds.

---

[9] Pruvit's lack of any rights under the Pruvit Sublicense is addressed in AGS's currently pending Motion to Dismiss Pruvit's Amended Complaint and AGS's Motion for Summary Judgement (both filed concurrently herewith).

(Millet Decl., Ex. D.)

On June 30, 2015, well beyond the 30-day cure period provided in Section 9.3 of the Pruvit Sublicense, Pruvit provided AGS a copy of a Certificate of Liability Insurance.  (Millet Decl., Ex. F.)  However, the Certificate of Liability Insurance, which was dated June 30, 2015, failed to cure Pruvit's breach. (Millet Decl. at ¶ 28.) The Certificate of Liability Insurance produced by Pruvit provided for aggregate coverage of only $2 million and did not list as "additional insureds" any of the entities required by Section 12.2 of the Pruvit Sublicense with the exception of AGS. (*Id.*)

Even though the Pruvit Sublicense never was effective in the absence of USF approval and would have terminated by operation of the express terms of the agreement several weeks earlier, as a matter of formality, AGS provided Pruvit with a formal notice of termination of the Pruvit Sublicense by letter dated July 22, 2015.  (Millet Decl., Ex. E.)[10]

### E.  Pruvit's Misappropriation of AGS's Trade Secrets and Patent Infringement

Notwithstanding the termination of the Pruvit Sublicense, and the lack of any rights to Asserted Patents or the Know-How, Pruvit has continued to market and sell its Ketosis Supplement, KETO//OS. (Millet Decl. at ¶ 33.) In doing so, Pruvit is causing irreparable harm to AGS and ForeverGreen by usurping ForeverGreen and AGS's rightful exclusive market position, diverting distributors and customers away from ForeverGreen, and tainting the market with an inferior Ketosis Supplement that is known to cause undesirable side-effects.

_____

[10] These breaches and lack of rights under the Pruvit License are the subject of a concurrently filed motion for summary adjudication by AGS.

**F.  AGS's Partnership with ForeverGreen**

Due to the multiple problems arising out of Pruvit's misconduct, on May 25, 2015, AGS granted ForeverGreen an exclusive license to the Vlahakos Patent in the multi-level marketing channel ("FG/Vlahakos Sublicense").[11] (Williams Decl. at ¶ 9.) On July 7, 2015, AGS and ForeverGreen executed a "Sublicense Agreement re USF Technology" (the "FG/USF Sublicense") granting ForeverGreen an exclusive sublicense to the USF Patent in the multi-level marketing channel.  (Williams Decl., Ex. A.)  With the FG/USF Sublicense in place, AGS and ForeverGreen moved forward with development and release of their own Ketosis Supplement called KetonX. (Millet Decl. at 41.) On July 10, 2015, ForeverGreen launched KetonX through its distributors world-wide. (Williams Decl. at ¶ 26.)

## III.   STATEMENT OF ISSUES

1.     Whether AGS and ForeverGreen should be granted a Temporary Restraining Order and/or a Preliminary Injunction against Pruvit, LaCore Labs, LaCore, Underwood, Harding, Funk, Dietrich, Deboer, and Rutherford to mitigate the damage being caused to AGS and ForeverGreen as a result of Pruvit's tortious misappropriation of trade secrets.

---

[11] AGS obtained exclusive rights to the Asserted Patents through the following transactions: On July 13, 2013, Axcess Global signed an exclusive license agreement with Dr. Vlahakos for the Vlahakos Patent. (Millet Decl. at ¶ 4.) On September 4, 2013, Axcess Global signed an "Exclusive License Agreement With Sublicensing Rights" (the "USF License") with the University of South Florida Research Foundation ("USF") for certain patent-pending technology. (Millet Decl. at ¶ 6.) Since then, the U.S. patent has issued as the USF Patent. (Millet Decl., Ex. B.) On February 24, 2015, Axcess Global assigned its rights as the exclusive licensee of the Vlahakos Patent to AGS.  (Millet Decl. at ¶ 5.) On December 8, 2014, Axcess Global assigned its rights in the USF License to AGS.  (Millet Decl. at ¶ 7.) Both of Asserted Patents are necessary to practice ketone technology, including KetonX and Pruvit's KETO//OS.

2.      Whether AGS and ForeverGreen should be granted a Temporary Restraining Order and/or a Preliminary Injunction against Pruvit, LaCore Labs, LaCore, Underwood, Harding, Funk, Dietrich, Deboer, and Rutherford to mitigate the damage being caused to AGS and ForeverGreen as a result of Pruvit's patent infringement.

3.      Whether the Court should order limited expedited discovery to facilitate production of the precise formula and additional evidence in support of AGS and ForeverGreen's Motion for Injunctive Relieve.

## IV.   ARGUMENT

### A.  The Court Should Order a Temporary Restraining Order and Preliminary Injunction to Mitigate Damages Resulting from Pruvit's Misappropriation of Trade Secrets and Patent Infringement.

Fifth Circuit law governs whether the Court should grant a temporary restraining order or preliminary injunction on AGS's claims against Pruvit for misappropriation of trade secrets. *See Daniels Health Sciences, L.L.C. v. Vascular Health Sciences, L.L.C.*, 710 F.3d 579, 582 (5th Cir. 2013) (applying fifth circuit law). Under Fifth Circuit law, "[t]o obtain a temporary restraining order or preliminary injunction, a plaintiff must establish the following elements by a preponderance of the evidence: (1) there is a substantial likelihood of success on the merits; (2) there is a substantial threat that irreparable injury will result if the injunction is not granted; (3) the threatened injury outweighs the threatened harm to the defendant; and (4) granting the preliminary injunction will not disserve the public interest." *Khan v. Fort Bend Indep. Sch. Dist.,* 561 F. Supp. 2d 760, 763 (S.D. Tex. 2008); *Daniels*, 710 F.3d at 582.

Preliminary injunctions enjoining patent infringement, however, are governed by Federal Circuit law. *Revision Military, Inc. v. Balboa Mfg. Co.*, 700 F.3d 524, 525 (Fed. Cir. 2012).

Importantly, the moving party need not to show a "substantial likelihood of success" but merely the "Federal Circuit's standard of whether success is more likely than not." *Revision Military*, 700 F.3d at 526. Specifically, under Federal Circuit law, to receive a preliminary injunction, the moving party must show (1) reasonable likelihood of success on the merits; (2) irreparable harm; (3) the balance of hardships tipping in its favor; and (4) the impact of the injunction on the public interest. *Hybritech Inc. v. Abbott Labs.*, 849 F.2d 1446, 1451 (Fed. Cir. 1988). These factors "taken individually, are not dispositive" and must be weighed against each other and the form and magnitude of the relief requested. *Hybritech Inc*, 849 F.2d at1451.

Here, Pruvit is using AGS's trade secret "Know-How" to manufacture and formulate its KETO//OS supplement. (Millet Decl. at ¶ 33.) Furthermore, Pruvit has admitted that AGS is the exclusive licensee, and ForeverGreen the sub-licensee, of patented ketone technology and that Pruvit does not have adequate licenses to the patented technology, or rights to related trade secrets that utilize this technology.  (S*ee* Complaint at ¶ 25.) Because Pruvit continues to market and sell its KETO//OS product, which utilizes the patented technology and also incorporates trade secrets that belong to AGS, there is an ongoing substantial threat of irreparable injury, a substantial likelihood of success on AGS and ForeverGreen's claims for misappropriation of trade secrets and patent infringement, and any harm to Pruvit or the public interest is outweighed by the damage being inflicted upon AGS and ForeverGreen.

### 1.  AGS has a substantial likelihood of success on the merits of its claim that Pruvit misappropriated its trade secrets.

"To show a likelihood of success, the plaintiff must present a *prima facie* case, but need not prove that he is entitled to summary judgment." *Id*. To establish misappropriation of trade secrets in Texas, a plaintiff must show "(a) the existence of a trade secret; (b) a breach of a

confidential relationship or improper discovery of the trade secret; (c) use of the trade secret; and (d) damages." *Id*. at 583. And, even if a confidentiality agreement related to trade secrets is found to have defects, "[a]n express agreement [is] not necessary where the actions of the parties, the nature of their arrangement, the 'whole picture' of their relationship established the existence of a confidential relationship." *Daniels*, 710 F.3d at 584.

> a. **The Know-How provided by AGS to Pruvit is a protectable trade secret.**

"A trade secret is any formula, pattern, device or compilation of information used in one's business, and which gives an opportunity to obtain an advantage over competitors who do not know or use it." *Id*. The existence of a trade secret is determined "by weighing six factors: "(1) the extent to which the information is known outside of the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken to guard the secrecy of the information; (4) the value of the information to the business and to its competitors; (5) the amount of effort or money expended in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others." *Id*. Even when the basic science behind a product has been disclosed in a patent or the ingredients have been disclosed, courts have found the precise formulation of a product to be a protectable trade secret. *In re Associated Indep. Marketers Inc. of Am.*, 1 F.3d 1237 (5th Cir. 1993); *Indus. Insulation Grp., LLC v. Sproule*, 613 F. Supp. 2d 844, 855 (S.D. Tex. 2009).

For example, in *Daniels*, the plaintiff developed a diet supplement, and began negotiating a marketing agreement with the defendant. *Id.* at 581. After failing to reach a licensing agreement with the defendant, the defendant developed a rival product – containing the same active ingredient, but with additional "fruit and vegetable extracts." *Id.* The court found that the

fact that "[w]ithin a few months" of breaking ties with [plaintiff], [defendant] was able to develop a "rival product" and "make the same essential claims [about it] that were attributed to [plaintiff's product]," was enough to demonstrate that defendant had used the trade secrets.  *Id.* at 584-85.

Like the trade secret supplement formulations in *Daniels*, Pruvit explicitly acknowledged—when it executed the Pruvit Sublicense—that AGS's formulations and other "Know-How" related to its proprietary Ketosis Supplements are trade secrets of AGS. (Millet Decl., Ex. D at § 1.12.) The Pruvit Sublicense defined "Know-How" to include formulations and any new formulations developed for Pruvit. (*Id.* at §1.12 & Appendix A.) Pruvit further acknowledged that AGS's formulations "are confidential and proprietary trade secrets and Know-How of [AGS] and that all information pertaining to such trade secrets will be treated as Confidential Information . . . ." (*Id.*) Without Pruvit's commitment to maintain the confidentiality of AGS's trade secrets under the Pruvit Sublicense, AGS would not have disclosed them to Pruvit. (Millet Decl. at ¶ 22.)

AGS holds its Know-How in strict confidence. (*Id.* at ¶ 19.) Within AGS, knowledge of AGS's Know-How is provided on a need-to-know basis and it is understood that the AGS product formulations are highly confidential (*Id.* at ¶ 20.) Furthermore, AGS has limited disclosure of its Know-How outside of the company to Pruvit, ForeverGreen, and a limited number of co-packers, each of which is under a strict non-disclosure contract. (*Id.* at ¶ 21.)

AGS's trade secret Know-How related to its Ketosis Supplements are highly valuable to competitors because AGS has expended a considerable amount of time and capital in developing it. (*Id.* at ¶ 35.) Additionally, without having access to AGS's formulations, Pruvit would not

18

know where to begin to engineer an effective formula that would (1) yield the benefits disclosed in the Asserted Patents, (2) have a suitable taste profile, and (3) be incorporated in a powder form. (*Id.* at ¶ 36.) Without misappropriating AGS's trade secrets Pruvit would not have been able to develop and begin selling its competing KETO//OS within months of severing ties with AGS. (*Id.* at ¶ 37.) This is evidenced by the fact that, prior to Pruvit's misappropriation of AGS's trade secrets, there was not a single other competitor in the Ketosis Supplement market, and indeed, Pruvit remains AGS and ForeverGreen's sole competitor at the time of this filing. (*Id.* at ¶ 38.)

It is clear by Pruvit's own acknowledgment, and the evidence demonstrating AGS's care to protect the formulations and other Know-How related to its Ketosis Supplements that the Know-How, including the ketosis supplement formulations, constitutes a protectable trade secret.

**b. Pruvit breached its confidential relationship related to AGS's trade secrets by continuing to utilize the trade secrets after the Pruvit Sublicense failed to become effective, or was terminated.**

Consistent with the holding in *Daniels* where the court held that defendant breached its confidential relationship by using plaintiff's trade secret formulations to develop a competing product without rights to do so, here, Pruvit breached its confidential relationship related to AGS's trade secret Know-How by using it to develop a competing Ketosis Supplement after Pruvit failed to obtain or otherwise forfeited any rights it may have had to use the proprietary formulations. (Millet Decl. at ¶ 18.) Because Pruvit has no rights under the Pruvit Sublicense, its ongoing use of AGS's trade secrets in the manufacture and sale of its KETO//OS product constitute an unequivocal breach of Pruvit's confidential relationship.

19

### c.   Pruvit is using AGS's trade secrets to manufacture KETO//OS.

Similar to the facts in the *Daniels* decision after gaining access to AGS's trade secret Know-How, Pruvit developed and began marketing KETO//OS, a product that incorporates, or is at very least derived from the proprietary Know-How provided to Pruvit by AGS. (Millet Decl. at ¶ 33.) Furthermore, the evidence that Pruvit is using AGS's trade secret Know-How is stronger here than in *Daniels*, since here there was no gap between the time that AGS severed its relationship with Pruvit and Pruvit's continued use of the trade secrets in the ongoing manufacture and sales of its KETO//OS product. (Millet Decl. at ¶ 25.)

Before learning AGS's trade secrets, Pruvit had no knowledge of Ketosis Supplements. (Millet Decl. at ¶ 23.) Because use of the patented ketone technology to develop a Ketosis Supplement is an emerging field, this is not a case where Pruvit could have acquired independent knowledge regarding Ketosis Supplement formulation from the public domain. (*Id.*) Pruvit obtained its knowledge about Ketosis Supplement formulation from the only source available, AGS. (*Id.*) Indeed Pruvit acknowledged the proprietary nature of the AGS Know How. Remarkably, now, Pruvit is selling its KETO//OS product, which it markets as being based on "a proprietary ketone energy technology." (Millet Decl. at ¶ 34.) This evidence leads to only one logical conclusion, Pruvit has used, and continues to use AGS's trade secret Know-How to manufacture a competing Ketosis Supplement as AGS was the only source for KETO//OS formulation and necessary rights to the Asserted Patents.

20

       **d.  AGS and ForeverGreen have suffered, and will continue to suffer, damages as a result of Pruvit's misappropriation of AGS's trade secrets.**

The damages suffered by AGS and ForeverGreen as a result of Pruvit's misappropriation of AGS's trade secrets are provided in detail is Section IVA(3) below.

       **e.  Pruvit's contract claim does not diminish the likelihood of success on the merits of AGS's trade secret claim.**

Arguing that use of intellectual property was authorized under a terminated agreement does not "significantly diminish Plaintiffs' likelihood of success on the merits."  *Petro Franchise Sys., LLC v. All Am. Properties, Inc.*, 607 F. Supp. 2d 781, 789 (W.D. Tex. 2009).  In *Petro Franchise*, the only dispute between the parties on a motion for preliminary injunction related to claims of trademark infringement was whether defendants' use of the marks was authorized.  *Id.* The *Petro* court found that when the plaintiffs showed the defendant had breached a prior licensing agreement, that was enough to show that that they were likely to succeed on their trademark infringement claim.  *Id.*  Although the defendants argued that the termination of the present agreement was not proper, and that the plaintiff's had themselves breached the agreements, the court found that such an argument required too many propositions to significantly diminish plaintiff's likelihood of success on the merits.  *Id.*

Here*,* like in *Petro Franchise*, Pruvit, at worst, failed to perfect rights in any alleged agreement, and at best, breached the clear language of the Pruvit Sub-license, and thus forfeited any rights they may have had to utilize the AGS's trade secret Know-How and the USF Patent. It is beyond dispute that a key conditions precedent to the Pruvit Sublicense becoming effective (*i.e.*, USF signing the agreement) never happened—so Pruvit never had any rights under the sub-license agreement to begin with.  In fact, Pruvit's Complaint explicitly states that "Axcess Global

. . . fail[ed] to adequately license the Technology to PruvIt," thus admitting that Pruvit never actually received any rights to utilize the Know-How or the technology related to the USF Patent. (*See* Complaint at ¶ 25.) In addition, Pruvit's lack of rights is further demonstrated by its breach of key contract provisions.  Similar to the decision in *Petro Franchise*, the language of the Pruvit Sublicense is not ambiguous and, upon breach by Pruvit, AGS complied with the specific termination provisions found therein.  Also like *Petro Franchise*, any arguments Pruvit may have about whether the termination of the licensing agreement was proper require too many propositions to significantly diminish AGS's likelihood of success on the merits.  Furthermore, since Pruvit has admitted they never received the rights to use the technology, a temporary restraining order and preliminary injunction is proper because Pruvit would not have the right to use AGS's trade secrets until final adjudication of this Action.  Based upon the foregoing analysis, AGS is likely to succeed on the merits of its misappropriation of trade secrets claim. Therefore, like *Daniels*, this factor favors granting AGS's Motion for Injunctive Relief.

> **2.  AGS and ForeverGreen have a established reasonable likelihood of success on their claims for patent infringement against Pruvit.**

To show a reasonable likelihood of success a plaintiff must demonstrate that it is likely the defendant infringed the patents, and that the infringement claim will likely withstand any challenges to the validity and enforceability of the patent. *Vehicular Technologies Corp. v. Titan Wheel Int'l, Inc.*, 141 F.3d 1084, 1088 (Fed. Cir. 1998).  Furthermore, to shift the burden of proof regarding the validity of the patent in the context of deciding a motion for preliminary injunction, the defendant must raise "'a substantial question' concerning validity, enforceability, or infringement." *Genentech, Inc. v. Novo Nordisk A/S*, 108 F.3d 1361, 1364 (Fed. Cir. 1997); *see also Jack Guttman, Inc. v. Kopykake Enterprises, Inc.*, 302 F.3d 1352, 1356-57 (Fed. Cir.

2002) ("[Since defendant] did not raise any validity defenses, analysis of this factor focused solely on the likelihood that [plaintiff] would be able to show infringement").

Whoever, without authority, makes, uses, offers to sell, sells any patented invention, within the United States, or imports into the United States any patented invention during the term of the patent, infringes the patent. 35 U.S.C. § 271(a).  A determination of patent infringement by a court requires a two-step process: (1) ascertain the scope of the claims via claim construction; (2) compare the claims to the allegedly infringing device. *Alexam, Inc. v. Best Buy Co.*, No. 2:10CV93, 2012 WL 1188406, at *1 (E.D. Tex. Apr. 9, 2012) (citing *Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1455 (Fed. Cir.1998) (en banc)). A patent is literally infringed if the accused product or process includes every element exactly as recited in at least one of its claims. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 1000 (Fed. Cir. 1995).

### a.  Induced Infringement of the Vlahakos Patent

It is reasonably likely that Pruvit and its distributors, including but not limited to Funk, Dietrich, Deboer, and Rutherford (named individuals collectively hereinafter referred to as "Distributors") indirectly infringe Claim 1 of the Vlahakos patent by inducing its distributors and customers to use KETO//OS as a weight management supplement. "Whoever actively induces infringement of a patent shall be liable as an infringer." 35 U.S.C. § 217(b). Induced infringement requires knowledge that the induced acts constitute patent infringement[12] and there can be no indirect infringement without direct infringement. (*Commil USA, LLC v. Cisco Sys.*,

---

[12] Although Pruvit may argue that it believes the Vlahakos Patent is invalid, an accused infringer's belief that a patent is invalid is not a valid defense to claims for induced infringement. *Commil*, 135 S.Ct. at 1928.

135 S.Ct. 1920, 1926 (2015)). Direct patent infringement occurs when all steps of a claimed

method, or process, are performed by a single entity. *Akamai Techs., Inc. v. Limelight Networks,*

*Inc.*, 797 F.3d 1020, 1022 (Fed. Cir. 2015).

Although analysis of patent infringement frequently requires claim construction, this is

not necessary here because each term of Claim 1 of the Vlahakos Patent would be readily

understood by a person of ordinary skill in the art according to its plain and ordinary meaning.

*Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005). Pruvit, LaCore Labs, LaCore,

Underwood, Harding, Funk, Dietrich, Deboer, and Rutherford have infringed, and continue to

infringe, the Vlahakos Patent by knowingly and actively inducing its customers and distributors

to perform the steps of the claimed process. Pruvit knows that its actions constitute infringement

of the Vlahakos because AGS told them about the patent and taught them how to make a Ketosis

Supplement that is covered by its claims. (Millet Decl. at ¶¶ 23-25.) Additionally, by selling

KETO//OS to its distributors and customers Pruvit is actively inducing them to perform every

step of the claimed process.

Claim 1 of the Vlahakos Patent reads as follows:

1. A process for causing weight loss, or avoidance of weight gain, in mammals, comprising oral administration to said mammals of . . . .sodium betahydroxybutyrate [and] calcium betahydroxybutyrate.

(Millet Decl., Ex. A at 8:64-9:12.)

The following claim chart provides a comparison of Pruvit's description of its KETO//OS

supplement to Claim 1 of the Vlahakos Patent, demonstrating that Pruvit induces its distributors

and consumers to infringe the patent by performing every step of this process claim:

| Claim 1 - Vlahakos Patent | KETO//OS |
|---|---|
| 1. A process for causing weight loss, or | "[KETO//OS] provides an exceptional nutritional |

| avoidance of weight gain, | foundation to help you lose weight, feel great and perform your very best." <br><br> http://pruvitnow.com/products/ketoos/ <br><br> "What are the benefits . . . weight loss & blood sugar balance." <br><br> http://pruvitnow.com/keto-basics/ |
|---|---|
| in mammals, comprising | "It is the first natural consumer product on the market to provide elevated blood ketone levels to the body." <br><br> http://pruvitnow.com/products/ketoos/ |
| oral administration to said mammals of | "KETO//OS (Ketone Operating System) is a revolutionary drink mix that is based on a proprietary ketone energy technology that delivers advanced macro nutritionals and promotes optimized cellular regeneration, energy and longevity." <br><br> http://pruvitnow.com/products/ketoos/ <br><br> "Take your first serving of KETO//OS between 6-9 am and your second serving between 1-4 pm." <br><br> http://pruvitnow.com/n8tive-zone/ |

butyric acid or one or more pharmaceutically effective and acceptable salts or derivatives of butyric acid selected from the group consisting of/butyric acid, **sodium butyrate**, **calcium butyrate**, potassium butyrate, magnesium butyrate, alphahydroxybutyric acid, sodium alphahydroxybutyrate, calcium alphahydroxybutyrate, potassium alphahydroxybutyrate, magnesium alphahydroxybutyrate, betahydroxybutyric acid, sodium betahydroxybutyrate, *calcium betahydroxybutyrate, potassium betahydroxybutyrate,* mangnesium betahydroxybutyrate, isobutyric acid, sodium isobutyrate, calcium isobutyrate, potassium isobutyrate, and magnesium isobutyrate.

"KETO/OS contains a specifically engineered ratio of proprietary ketone mineral salts"

http://pruvitnow.com/products/ketoos/



The beta-hydroxybutyrate identified as an ingredient on the KETO//OS label comes from two ketone mineral salts, calcium beta-hydroxybutyrate and sodium beta-hydroxybutyrate. (Dr. Jones Decl. at ¶ 16.)

26

**b.  Pruvit's infringement of the USF Patent**

It is reasonably likely that Pruvit, LaCore Labs, LaCore, Underwood, Harding, Funk, Dietrich, Deboer, and Rutherford directly infringe at least Claim 1 of the USF Patent by making, using, selling, offering for sale, and/or importing KETO//OS. Claim 1 of the USF Patent reads, in relevant part, as follows:

> A composition, comprising: at least one medium chain fatty acid or ester thereof in an amount between about 5 grams and about 50 grams; and at least one beta-hydroxybutyrate compound in an amount between about 2 grams and about 50 grams, wherein the at least one beta-hydroxybutyrate compound is comprised of a beta-hydroxybutyrate salt.

(Millet Decl., Ex. B at 19:36-43.)

Pruvit directly infringes Claim 1 of the USF Patent because its KETO//OS supplement includes each and every element of the composition claimed therein. Again, the process of claim construction is not necessary in this case because each claim term would be readily understood by a person of ordinary skill in the art by its plain and ordinary meaning.  *Phillips*, 415 F.3d at 1312. The following claim charts provides a comparison of Pruvit's KETO//OS supplement to the Claim 1 of the USF Patent demonstrating that Pruvit's product includes every element of the claim:

| Claim 1 – USF Patent | KETO//OS |
|---|---|
| What is claimed is:<br>1. A composition, comprising: | |

| at least one medium chain fatty acid or ester thereof |  |
| | Typical MCT Powders are made up of MCT Oil and no-fat powder milk. MCT Oil is composed of medium chain triglycerides, which are esters of medium chain fatty acids with glycerol. Therefore, the MCT Powder identified on the label of KETO//OS contains an ester of at least one medium chain fatty acid.  (*See* Dr. Jones Decl., at ¶¶ 10-14.) |
| in an amount between about 5 grams and about 50 grams;. | According to its label, KETO//OS contains at least 7 grams of MCT Oil, which corresponds to 7 grams of an ester of a medium chain fatty acid. (*See* Dr. Jones Decl. at ¶¶ 10-14.) |

| | |
|---|---|
| and at least one beta-hydroxybutyrate compound |  |
| | The KETO//OS label identifies "Beta Hydroxybutyrate" as one of its ingredients. Furthermore, based on its label, the beta-hydroxyrate compounds in KETO//OS are likely sodium beta-hydroxybutyrate and calcium beta-hydroxybutyrate. (Dr. Jones Decl. at ¶16.) |
| in an amount between about 2 grams and about 50 grams, | Based on the information on the product label, KETO//OS likely contains just over 5 grams of calcium beta-hydroxybutyrate and just over 5 grams of sodium beta-hydroxybutyrate. Therefore, KETO//OS contains at least 10 grams of a beta-hydroxybutyrate compound (*See gen.*, Dr. Jones Decl.) |

| | |
|---|---|
| wherein the at least one beta-hydroxybutyrate compound is comprised of a betahydroxybutyrate salt. | "KETO//OS contains a specifically engineered ratio of proprietary ketone mineral salts"<br><br>http://pruvitnow.com/products/ketoos/<br><br><br><br>Based on the product label, KETO//OS likely includes both calcium beta-hydroxybutyrate and sodium beta-hydroxybutyrate, both of which are beta-hydroxybutyrate salts. (Dr. Jones Decl. at ¶ 16.) |

As demonstrated by the foregoing claim charts and declaration of Dr. Jones, Pruvit's

KETO//OS product includes each element of the identified claims. (*See generally,* Dr. Jones

Decl.) As such, it is highly likely that Pruvit's KETO//OS product infringes at least claims 1 of

both the Vlahakos Patent and the USF Patent. Accordingly, this factor weighs heavily in favor of

granting AGS's Motion for Injunctive Relief.

### c.  The Asserted Patents are valid and enforceable.

"In asserting patent invalidity as a defense to an infringement action, an alleged infringer

must contend with § 282 of the Patent Act of 1952(Act), under which '[a] patent shall be

presumed valid' and '[t]he burden of establishing invalidity ... shall rest on the party asserting'

it." *Microsoft Corp. v. i4i Ltd.,* 131 S. Ct. 2238, 2239, (2011). To shift the burden of proof

regarding the validity of the patent in the context of deciding a motion for preliminary injunction,

the defendant must raise "'a substantial question' concerning validity, enforceability, or

infringement." *Genentech, Inc. v. Novo Nordisk A/S, 108 F.3d 1361, 1364* (Fed. Cir. 1997); *see*

*also Jack Guttman, Inc. v. Kopykake Enterprises, Inc.*, 302 F.3d 1352, 1356-57 (Fed. Cir. 2002)

("[Since defendant] did not raise any validity defenses, analysis of this factor focused solely on

the likelihood that [plaintiff] would be able to show infringement"). Here, Pruvit has not raised

any substantial question concerning validity of either the Vlahakos Patent or the USF Patent.[13]

In fact, Pruvit has requested relief in the form of specific performance in relation to the Pruvit

---

[13] On September 15, 2015 Pruvit filed a request for *inter partes* review of the '356 Patent with
the United States Patent Office ("USPTO"). The USPTO has not yet made a determination as to
whether there is a "reasonable likelihood that Pruvit will prevail, which is the threshold standard
for granting a petition for *inter partes* review.

Sublicense, effectively seeking a license to the USF Patent—a form of relief which would be meaningless if the patents were invalid. (*See* Complaint at 12.)  It comes with ill grace that Pruvit seeks protection under patents to secure exclusivity while it simultaneously asserts invalidity.

> **d.   Pruvit's contract claim does not diminish the substantial likelihood of success on the merits of AGS and ForeverGreen's patent infringement claims.**

As argued in Section IV(A)(1)(e) above, the language of the Pruvit Sublicense is clear, AGS followed the termination provision of the Pruvit Sublicense, and Pruvit's breach of contract claim requires too many propositions to significantly diminish AGS's likelihood of success on the merits of these claims. Accordingly, any argument that Pruvit may make regarding rights under the USF Patent by virtue of the Pruvit Sublicense do not change the substantial likelihood of success on the merits of AGS's patent infringement claims with respect to the USF Patent. Furthermore, the Vlahakos Patent is not even addressed in the Pruvit Sublicense. Accordingly, Pruvit's contract claims have no bearing on AGS's claims against Pruvit for infringement of the Vlahakos Patent.

> **3.   AGS and ForeverGreen have suffered, and continue to suffer, irreparable injury as a result of Pruvit's misappropriation of AGS's trade secrets and patent infringement.**

"In a situation where trade secrets and goodwill are involved, the threat is significant that the harm experienced by the misappropriation or misuse of trade secrets will be irreparable." *Am. Exp. Fin. Advisors, Inc. v. Scott*, 955 F. Supp. 688, 693 (N.D. Tex. 1996).  Price erosion, loss of goodwill, damage to reputation, loss of market share, and loss of business opportunities are all valid grounds for finding irreparable harm." *Golden Hour Data Sys. v. emsCharts, Inc*, No. 2:06-CV-381, U.S. Dist. LEXIS 95640, at *30 (E.D. Tex. Mar. 31, 2014) (citing *Celsis In Vitro, Inc.*

*v. CellzDirect, Inc.*, 664 F.3d 922, 930 (Fed. Cir. 2012); *Abbott Labs. v. Sandoz, Inc.*, 544 F.3d 1341, 1361-62 (Fed. Cir. 2008) (finding irreparable harm due to patent infringement as a result of price erosion and loss of market share). Furthermore, the risk that "a poor knock-off would be associated with [the plaintiff] to his reputational detriment," is an irreparable harm, justifying a preliminary injunction. *Daniels*, 710 F.3d at 585; *Reebok Int'l Ltd. v. J. Baker, Inc.*, 32 F.3d 1552, 1558 (Fed. Cir. 1994). All of these severe harms are present in this case.

Since "the principal value of a patent is its statutory right to exclude, the nature of the patent grant weighs against holding that monetary damages" are sufficient. *Hybritech*, 849 F.2d at 1456. Patent infringement "may have market effects never fully compensable in money." *Id.* at 1457.

For example, in *Polymer Technologies*, the Federal Circuit acknowledged that "[c]ompetitors change the marketplace," and "it may be impossible to restore a patentee's (or an exclusive licensee's) exclusive position by an award of damages and a permanent injunction," due to customer's establishing a relationship with infringers and customer's getting used to lower prices. *Polymer Tech.*, 103 F.3d at 975. Other factors that the Federal Circuit has looked at include whether (1) the field of technology was new and (2) there was a substantial amount of competition. *Hybritech*, 849 F.2d at 1456.

As outlined in detail below, Pruvit has caused, and continues to cause irreparable harm to AGS and ForeverGreen as a result of its misappropriation of trade secrets and patent infringement. AGS and ForeverGreen have established that the Vlahakos Patent and the USF Patent carry a presumption of validity, which has not been challenged in this action, and that it is reasonably likely that Pruvit infringes them. Thus, in addition to the specifically identified

irreparable harms outlined below, there is presumption that irreparable harm will be caused if Pruvit is not preliminarily enjoined from infringing the patents. *See Pfizer*, 429 F.3d at 1381.

### a.  Price Erosion

AGS and ForeverGreen will be irreparably harmed because they may be forced to drop the price of KetonX to compete with Pruvit. Pruvit is currently selling the infringing KETO//OS to distributors for as low as $4.09 per serving, depending on the volume of product purchased. ForeverGreen sells its product to distributors for $5.99 per serving. (Williams Decl. at ¶ 35.) So, in many instances, Pruvit is selling its inferior product to distributors at a 32% discount from ForeverGreen's legitimate price. (*Id.*) Distributor relationships are very important in the network marketing industry, and ForeverGreen invests heavily in recruiting and forging strong and personal relationships with its distributors. (*Id*. at ¶ 36.) Like most products, the pricing for dietary weight management supplements like KetonX tend to be a key component, in that customers do not want, or expect, the price of the product to go up over time. If ForeverGreen is forced to reduce the price of its KetonX product to match Pruvit's KETO//OS, ForeverGreen will likely not be able to increase its price back to its original price in the future without destroying the good will and customer relationships that ForeverGreen has worked so hard to foster. (*Id.* at ¶ 36.)

### b.  Reputational Harm

The reputational harm resulting to the Ketosis Supplement market as a result of Pruvit's inferior KETO//OS will not be fully compensable by money and could damage the market permanently. (Williams Decl. at ¶¶ 38-41.) Pruvit's KETO//OS supplement competes directly with ForeverGreen's KetonX supplement in the marketplace. Despite known issues with side

effects associated with KETO//OS (e.g., headaches, diarrhea, and nervous system issues), KETO//OS and KetonX are seen as alternatives to each other, with each product being used as a ketosis weight management supplement. (*Id.*) Because of these known health problems associated with KETO//OS, and the fact that these negative side effects are being discussed online, distributors and other consumers in the market will likely attribute these negative side effects to Ketosis Supplement generally, rather than an isolated issue with KETO//OS.  (*Id.*) As such, AGS and ForeverGreen will be irreparably harmed because consumers and distributors will likely develop a negative impression about the Ketosis Supplement industry as a whole because of the side effects associated with Pruvit's KETO//OS, thereby creating skepticism about the effectiveness of Ketosis Supplements and less demand for the product in the market.

### c.  Irreparable Harm to Shareholder Value

Pruvit's misappropriation of trade secrets and patent infringement, have caused irreparable harm to the share value of ForeverGreen. (Williams Decl. at ¶ 44.)  As a publicly traded company, ForeverGreen relies on consumer confidence to protect the value of its shares. (*Id.*)  The reputational harms described above not only taint the Ketosis Supplement market as a whole, but they also have a direct negative impact on ForeverGreen's share value. If Pruvit is not enjoined, ForeverGreen will be irreparably harmed by ongoing erosion of its share value. (*Id.*)

### d.  Loss of Market Share

Pruvit's misappropriation of AGS's trade secret and infringement of the Asserted Patents have caused, and continue to cause, irreparable injury to both AGS and ForeverGreen because these inappropriate acts have deprived them of the benefits of market exclusivity that they would otherwise have enjoyed absent competition from Pruvit's KETO//OS product. (Williams Decl. at

¶¶ 32-34.) After the failed relationship between AGS and Pruvit, AGS partnered with

ForeverGreen, through the royalty-bearing FG/USF Sublicense, to develop and market a Ketosis

Supplement called KetonX. (Millet Decl. at ¶ 41.)  However, aided by its misappropriation of

AGS's trade secrets and patent infringement, Pruvit beat AGS and ForeverGreen to market with

its own Ketosis Supplement, KETO//OS. (Williams Decl. at ¶ 31.) As the first entrant to market

with a Ketosis Supplement, using AGS's proprietary trade secrets, Pruvit generated significant

interest in its KETO//OS supplement and took a portion of the market that AGS and

ForeverGreen are rightfully entitled to by virtue of their rights in the Asserted Patents.

### e.  Loss of Business Opportunities and Good Will

By being first to market, Pruvit inappropriately usurped a significant business advantage

from AGS and ForeverGreen, resulting in irreparable harm to both. (Williams Decl. at ¶¶ 28-34,

42-43.) Through AGS and the FG/USF Sublicense, ForeverGreen is the only company with

rights to the Asserted Patents and associated Know-How in the multi-level marketing channel

and it should have enjoyed the benefit of being first to market, as well as ongoing exclusivity in

the Ketosis Supplement market. (*Id*.)

There is a significant advantage in being first to market, particularly where, as here, the

product is revolutionary. (*Id*.) The network marketing industry is a close-knit industry and

distributors are constantly watching for exciting new products. (*Id*.) When a revolutionary

product is launched, it creates a buzz in the industry and attracts distributors who are excited to

take the new product to their previously established downlines, resulting in potentially

exponential growth. (*Id*.) As such, the initial launch of a new product allows the first company to

market to establish a large customer and distributor base and the distributors are incentivized to

stay with a company because doing so allows them to collect a percentage of the product sales from the customers and distributors that they have introduced to the company. (*Id.*) Therefore, even if a better competing product comes along, the distributors are not likely to leave the original company, because doing so would require them to walk away from the ongoing earnings generated by their established downline. (*Id.*)

When a product in a new product category like this is released, the first company to release the product gains specific advantages, one of which is brand recognition by the public. (Williams Decl. at ¶¶ 28-34, 42-43.) Because it is the first product, the public will associate that product with the company that introduces it. (*Id.*) Most new products get introduced by a company that has invested the time and economic resources to create a new technology and product. (*Id.*) It then enjoys a first-to-market advantage to capitalize on that investment. (*Id.*) In this case, however, Pruvit did not invest in the technology or spend nearly the resources that AGS and ForeverGreen did to create this new product, yet it is reaping the rewards as if it did through inappropriate misappropriation of Know-How and infringement. (*Id.*) The longer Pruvit is allowed to sell its product, the more AGS will be damaged by losing the association in the mind of the consuming public that AGS and ForeverGreen should enjoy. (*Id.)* AGS and ForeverGreen have also been irreparably harmed as a result of lost prospective distributors following Pruvit's misappropriation of AGS's trade secrets. (*Id.*) As mentioned previously, the initial launch of a revolutionary product, in the network marketing industry is essential to attract a base of customers and distributors to the new product. (*Id.*) By being the first to market with its KETO//OS product, Pruvit benefited from this heightened initial interest and secured a large portion of the customers and distributors who were waiting for this type of

revolutionary product to be released in the network marketing industry. (*Id.*) Because of the momentum Pruvit gained during this initial launch, it is likely that Pruvit will gain additional customers and distributors, who undoubtedly would have joined ForeverGreen had ForeverGreen rightly been first to market and the sole source of Ketosis Supplements in the industry. (*Id.*)

Furthermore, through use of AGS's trade secrets, Pruvit has convinced several ForeverGreen distributors and customers to leave the KetonX product line to sell for Pruvit.  (*Id.* at ¶ 32.) AGS and ForeverGreen have experienced further damage as a result of Pruvit's use of AGS's trade secrets because there is a limited supply of beta-hydroxybutyrate salts ("BHB Salts"), which are a vital ingredient in AGS's Ketosis Supplement formulations. (Millet Decl. at ¶ 42.) Accordingly, Pruvit's utilization of these BHB Salts in its KETO//OS product has reduced the volume of BHB salts that are available for use in the manufacture of ForeverGreen's KetonX product. (*Id.* at ¶ 43.)

Finally, AGS and ForeverGreen are likely to suffer future losses as a direct result of Pruvit's ongoing sales of KETO//OS if Pruvit is not enjoined from its misappropriation of AGS's trade secrets. Pruvit has represented that it was selling $100,000 of KETO//OS each day within 32 minutes. (Williams Decl. at ¶ 37.) Pruvit claims that a cap was previously set on sales so that no more than $100,000 worth of product was sold each day to make sure that Pruvit could keep up with production. (*Id.*) Pruvit also indicated that as early as September 26, 2015, the daily cap had been lifted allowing for sales of more than $100,000 each day. (*Id.*) Because of the snowball effect as a network marketing industry gains momentum, and its distributor network grows, this number is sure to increase rapidly. (*Id.*) However, even if this number remained steady, because AGS and ForeverGreen should be entitled to market exclusivity by virtue of the AGS's trade

secrets and the parties' rights in the Asserted Patents, ForeverGreen would be losing out on at least $36.5 M annually. (*Id.*)

### 4.   The balance of the harms favor AGS and ForeverGreen.

"[A]n alleged infringer's loss of market share and customer relationships, without more, does not rise to the level necessary to overcome the loss of exclusivity experienced by a patent owner due to infringing conduct. *Pfizer, Inc. v. Teva Pharm., USA, Inc.*, 429 F.3d 1364, 1382 (Fed. Cir. 2005). In *Pfizer,* the defendant's claims that it had already built up manufacturing facilities and prepared to market a product and would lose market share and customer relationships, were not enough to overcome the loss of exclusivity experienced by a patent owner due to infringing conduct. *Id.* Similarly, in *Daniels*, the Fifth Circuit found that, even though the defendant had spent money to market and sell the product, these "damages were compensable [and] the market for the supplement would not go away . . . ." *Id.* Thus, any harm to the defendant did not outweigh the irreparable injury that would be suffered by the plaintiff without the injunction. *Id.*

Here, like *Pfizer* and *Daniels*, any argument by Pruvit that the balance of the hardships weigh in its favor because it has built up manufacturing facilities and began to market its KETO//OS product, or that it would lose market share and customer relationships as a result of a temporary restraining order or preliminary injunction are not sufficient to overcome the loss of exclusivity experienced by AGS and ForeverGreen as the exclusive licensees of the Asserted Patents as a result of Pruvit's infringement. Similarly, like *Daniels*, the Ketosis Supplement industry is in its infancy and it is unlikely that a preliminary injunction will cause the market to go away. For these reasons, any harm that Pruvit may experience as a result of granting AGS and

ForeverGreen's Motion is outweighed by the irreparable injury that will certainly be experienced by AGS and ForeverGreen absent entry of a temporary restraining order and preliminary injunction.

### 5.   The public interest will be best served by granting this Motion.

"The public interest is served by protecting trade secrets." *Picker Int'l, Inc. v. Blanton*, 756 F. Supp. 971, 983 (N.D. Tex. 1990).  There is also a strong" public policy inherent in the patent laws designed to encourage useful inventions by rewarding the inventor with a limited period of market exclusivity." *Pfizer*, 429 F.3d at 1382. "[S]elling a lower priced product does not justify infringing a patent." *Id.*  "This justification for sacrificing short-term price competition in order to foster creativity and improvement of products in the long-run is particularly applicable to the pharmaceutical industry." *Eli Lilly & Co. v. Premo Pharm. Labs., Inc.*, 630 F.2d 120, 137 (3d Cir. 1980).

In *Daniels*, the court rejected the defendants' argument that the public interest would be disserved by "barring public access to a supplement with significant potential health benefits" and stopping defendants from turning a profit.  The court found that the public had a greater interest in furthering the plaintiff's research, and that "the public is served when the law is followed." *Daniels*, 710 F.3d at 585.

Here, the public interests will be served by granting a temporary restraining order and preliminary injunctive relief because it will encourage further research into Ketosis Supplements by AGS and ForeverGreen, protect AGS's trade secrets, and ensure that the laws with respect to trade secrets and patents are followed.  Although AGS is the exclusive licensee, and not the inventor, the public interests of rewarding the holder of patent rights with a limited period of

exclusivity wherein they can reap the benefit of the invention will be benefited by granting this Motion. Furthermore, granting this temporary restraining order and preliminary injunction would not bar public access to a supplement with significant potential health benefits, since AGS has partnered with ForeverGreen to make its KetonX supplement publically available. (Millet Decl. at ¶ 41.)

Furthermore, the public interest will actually be disserved by denying this Motion. Ketosis technology is a rapidly developing new technology, and AGS's research and investment into Know-How has been vital in furthering the technology and preventing harmful side-effects in the ForeverGreen and AGS product formulations. (Millet Decl. at ¶ 44; Williams Decl. at ¶ 39.) Allowing Pruvit to continue marketing its KETO//OS product, while utilizing an outdated version of AGS's Know-How, without the benefit of AGS and ForeverGreen's latest research and formulations, runs the risk of Pruvit's sub-standard products being foisted upon the public, causing unknown and unforeseeable health risks and giving the entire product category a negative reputation in the eyes of the consuming public. (Williams Decl. at ¶ 39-41.)

## B. To the Extent Further Evidence is Necessary to Support a Preliminary Injunction, the Court Should Grant the Request for Expedited Discovery Because it is Reasonable in Light of the Circumstances.

The Fifth Circuit has not yet settled on the standard to order expedited discovery. *St. Louis Grp., Inc. v. Metals & Additives Corp.*, 275 F.R.D. 236, 240 (S.D. Tex. 2011). However, district courts in the Fifth Circuit generally apply the "good cause" standard when addressing the issue. *Id.*; *El Pollo Loco, S.A. de C.V. v. El Pollo Loco, Inc.*, 344 F.Supp.2d 986, 991 (S.D. Tex. 2004); *Combat Zone Corp. v. John/Jane Does 1-2*, No. 2:12-CV-00509, 2012 WL 6684711, at *1 (E.D. Tex. Dec. 21, 2012). "In a 'good cause' analysis, a court must examine the discovery

request "on the entirety of the record to date and the ***reasonableness*** of the request in light of all the surrounding circumstances." *St. Louis Grp.*, 275 F.R.D. at 239.  In determining whether good cause exists, courts commonly consider "(1) whether a preliminary injunction is pending; (2) the breadth of the discovery requests; (3) the purpose for requesting the expedited discovery; (4) the burden on the defendants to comply with the requests; and (5) how far in advance of the typical discovery process the request was made." *Id.* at 240 n. 4.

In connection with the present Motion, AGS and ForeverGreen request that the Court order expedited discovery with respect to the following topics:

1.      Pruvit's previous and current formulations for its KETO//OS product, including its use of AGS's trade secret information in deriving those formulations;

2.      Pruvit's marketing of its KETO//OS product in the MLM channel;

3.      Pruvit's communications with product suppliers and manufacturers;

4.      Pruvit's testing related to the effectiveness of its KETO//OS product.

5.      Customer feedback related to KETO//OS.

Good cause exists for the Court to grant expedited discovery on these topics, and it would be reasonable under the circumstances to do so, because (a) there is a preliminary injunction pending, (b) AGS and ForeverGreen have narrowly tailored their requests which will result in a relatively low burden on Pruvit to respond, (c) the discovery requested will shed immediate, and likely dispositive, light on AGS and ForeverGreen's likelihood of success on their claims for misappropriation of trade secrets and patent infringement, thus mitigating the irreparable harm suffered by AGS, and  (e) due to the infancy of this litigation, and in light of AGS and ForeverGreen's pending motions to dismiss (Dkt. Nos. 11 & 13), it will likely be several months

before AGS and ForeverGreen would be able to obtain this information through the ordinary course of discovery.

## V.   CONCLUSION

For the forgoing reasons, the Court should grant AGS and ForeverGreen's Motion to protect AGS from suffering further irreparable injury as a result of Pruvit's misappropriation of trade secrets and patent infringement.

DATED: October 26, 2015

By: */s/ Charles L. Roberts*

Charles L. Roberts *(pro hac vice admission)*
**WASATCH-IP, A PROFESSIONAL CORP.**
2825 E. Cottonwood Parkway, Suite 500
Salt Lake City, Utah 84121
Telephone: 801-292-5300
Facsimile: 801-506-6699
*croberts @wasatch-ip .com*

Attorneys for Defendant
Axcess Global Sciences, LLC

By: */s/ Larry R. Laycock*

Lance Jensen(Texas Bar No.: 24069995)
Larry R. Laycock *(pro hac vice admission)*
Tyson K. Hottinger *(pro hac vice admission)*
Adam B. Beckstrom *(pro hac vice admission)*
**MASCHOFF BRENNAN**
201 South Main Street, Suite 600
Salt Lake City, Utah 84111
Telephone: 435-252-1360
Facsimile: 435-252-1361
*ljensen@mabr.com*
*llaycock@mabr.com*
*thottinger@mabr.com*
*abeckstrom@mabr.com*

Attorneys for Defendant
ForeverGreen International, LLC

**CERTIFICATE OF CONFERENCE**

Pursuant to Local Rule CV-7(i), the undersigned attorney hereby certifies compliance with the meet and confer requirement in Local Rule CV-7(h) before filing this opposed motion. The undersigned attorney certifies that Tyson K. Hottinger met and conferred with counsel for Plaintiff, David Binford on October 23, 2015, and Jenifer Grace on October 26, 2015 about the relief sought herein. The parties were unable to reach an agreement during these conferences leaving an open issue for the court to resolve.

/s/ Larry R. Laycock
Larry R. Laycock

44

## CERTIFICATE OF SERVICE

I hereby certify that on October 26, 2015, I caused a true and correct copy of the foregoing document to be filed with the Clerk of Court and served on all counsel of record via CM/ECF pursuant to Local Rule CV-5(a).


/s/ *Larry R. Laycock*
Larry R. Laycock


## CERTIFICATE OF AUTHORIZATION TO FILE UNDER SEAL

Pursuant to Local Rule CV-5(a)(7)(A), this is to certify that defendant and counterclaimant ForeverGreen International, LLC has filed a motion to seal Exhibits D and F attached to the Declaration of Gary Millet and Exhibits A, B, C, H, and K attached to the Declaration of Ron Williams, both of which are filed concurrently herewith.


*/s/ Larry R. Laycock*
Larry R. Laycock


45